GARRY G. MATHIASON, Bar No. 051119
ANDREW M. SPURCHISE, Bar No. 245998
JESSICA X. ROTHENBERG, Bar No. 284823
LITTLER MENDELSON, P.C.
650 California Street
20th Floor
San Francisco, California  94108.2693
Telephone:    415.433.1940
Facsimile:    415.399.8490

Attorneys for Defendants
ALLIANZ ASSET MANAGEMENT OF
AMERICA L.P., ALLIANZ ASSET
MANAGEMENT OF AMERICA LLC and
ALLIANZ GLOBAL INVESTORS U.S. LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SEUNG MINN,<br><br>Plaintiff,<br><br>v.<br><br>ALLIANZ ASSET MANAGEMENT OF AMERICA L.P., a Delaware limited partnership, ALLIANZ ASSET MANAGEMENT OF AMERICA LLC, a Delaware limited liability company, ALLIANZ GLOBAL INVESTORS U.S. LLC, a Delaware limited liability company, and DOES 1-25,<br><br>Defendants. | Case No.<br><br>**NOTICE OF REMOVAL OF CIVIL ACTION TO FEDERAL COURT FROM STATE COURT BY DEFENDANTS PURSUANT TO 28 U.S.C. § 1331,  § 1441(a) (FEDERAL QUESTION JURISDICTION)** |

LITTLER MENDELSON, P.C.
650 California Street
20th Floor
an Francisco, CA 94108.2693
415.433.1940

NOTICE  OF  REMOVAL  TO  FEDERAL
COURT

1  TO THE CLERK OF THE ABOVE-ENTITLED COURT AND PLAINTIFF SEUNG MINN AND

2  HIS ATTORNEYS OF RECORD:

3      PLEASE TAKE NOTICE that Defendants ALLIANZ ASSET MANAGEMENT OF

4  AMERICA L.P., ALLIANZ ASSET MANAGEMENT OF AMERICA LLC and ALLIANZ

5  GLOBAL INVESTORS U.S. LLC ("Defendants") hereby remove the action entitled *Seung Minn v.*

6  *Allianz Asset Management of America L.P., a Delaware limited partnership, Allianz Asset*

7  *Management of America LLC, a Delaware limited liability company, Allianz Global Investors U.S.*

8  *LLC, a Delaware limited liability company, and DOES 1-25*, Case No. GCG-14-538538, from the

9  Superior Court of California for the County of San Francisco, to the United States District Court for

10  the Northern District of California.  Removal is based on federal question jurisdiction pursuant to 28

11  U.S.C. §§ 1331, 1441(a) based on the following grounds:

12  **I.   STATEMENT OF JURISDICTION**

13      1.   This Court has original jurisdiction over this action pursuant to 28 U.S.C. §

14  1331 because federal question jurisdiction exists.   Plaintiff's Complaint ("the Complaint") is

15  properly maintained in federal court because the causes of action set forth in Plaintiff's Complaint

16  are preempted by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et. seq.*

17  ("ERISA").

18      2.   This Court thus has supplemental jurisdiction over Plaintiff's state law causes

19  of action, if any, pursuant to 28 U.S.C. Section 1367(a), in that Plaintiff's state law causes of action

20  form part of the same case or controversy under Article III of the United States Constitution as those

21  claims for relief over which the Court has original jurisdiction.

22  **II.   VENUE IS PROPER**

23      3.   Venue properly lies in the United States District Court for the Northern

24  District of California because this action was filed in the Superior Court of California for the County

25  of San Francisco.  *See* 28 U.S.C. §§ 84(a), 1391, 1446.

26  **III.   PLEADINGS, PROCESS AND ORDERS**

27      4.   This lawsuit arises out of the employment of Plaintiff Seung Minn with

28  Allianz Global Investors U.S. LLC. On April 9, 2014, Plaintiff filed a Complaint in the Superior

LITTLER MENDELSON, P.C.
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

NOTICE OF REMOVAL TO FEDERAL
COURT

2.

Court of the State of California, County of San Francisco, entitled *Seung Minn v. Allianz Asset Management of America L.P., a Delaware limited partnership, Allianz Asset Management of America LLC, a Delaware limited liability company, Allianz Global Investors U.S. LLC, a Delaware limited liability company, and DOES 1-25*, bearing Case No. GGC-14-538538. *See* **Exhibit A** (the "Complaint").

5. The Complaint purports to assert the following claims for relief: (1) Breach of Contract – LTIPA; (2) Breach of Contract – DIF; (3) Failure to Pay Earned Wages; (4) Waiting Time Penalties; and (5) Conversion. *See* **Exhibit A**.

6. Defendants agreed to accept service of the Summons and Complaint by Notice and Acknowledgement and received the Notice and Acknowledgement on April 11, 2014. *See* **Exhibits A, B** (Notice and Acknowledgment of Service); Cal. Code Civ. Proc. § 415.30.

7. The San Francisco Superior Court issued a Notice of Case Management Conference in this matter for September 10, 2014 in Department 610 of that court. *See* **Exhibit C.**

8. Defendants acknowledged receipt of the Summons and Complaint on April 30, 2014, thereby completing service. *See* **Exhibit D**; Cal. Code Civ. Proc. § 415.30.

9. Pursuant to 28 U.S.C. section 1446(a), the attached exhibits constitute all process, pleadings and orders served upon Defendants or filed or received in this action by Defendants.

**IV. NOTICE OF REMOVAL TO STATE COURT AND PLAINTIFF'S COUNSEL**

10. Contemporaneously with the filing of this Notice of Removal in the United States District Court for the Northern District of California, written Notice of Removal will be provided by the undersigned to Plaintiff's counsel of record, Richard A. Hoyer and Ryan L. Hicks of HOYER & ASSOCIATES, and a copy of this Notice of Removal will be filed with the Clerk of the Superior Court for the State of California, County of San Francisco, as required by 28 U.S.C. §1446(d).

**V. TIMELINESS OF REMOVAL**

11. Pursuant to 28 U.S.C. section 1446(b), a notice of removal of a civil action must be filed within thirty (30) days of service of the Summons and Complaint. *See Murphy Bros.,*

LITTLER MENDELSON, P.C.
650 California Street
20th Floor
an Francisco, CA 94108.2693
415.433.1940

NOTICE OF REMOVAL TO FEDERAL COURT
3.

1    *Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 356 (1999) (noting the 30-day removal period

2    runs from the service of the summons and complaint).

3          12.    Defendants acknowledged receipt on April 30, 2014, which is the date service

4    was complete. *See* **Exhibit D**; Cal. Code Civ. Proc. § 415.30(c). Pursuant to 28 U.S.C. section

5    1446(b) and Federal Rule of Civil Procedure, Rule 6(a)(1)(C), this Notice of Removal is therefore

6    timely filed as it is filed within thirty (30) days after Defendants were effectively served with the

7    Summons and Complaint and within one year after commencement of this action. *Murphy Bros.,*

8    *Inc. v. Michetti Pipe Stringing, Inc.,* 526 U.S. 344, 347-48, 354 (holding removal period is triggered

9    by completed service of process); *Panchias v. Bullock*, 2012 U.S. Dist. LEXIS 158490, *3 (E.D. Cal.

10    Nov. 5, 2012) (holding removal period begins after notice of acknowledgment and receipt signed);

11    *Star Varga v. United Airlines*, 2009 U.S. Dist. LEXIS 64000, *7-10 (N.D. Cal. Jul. 24, 2009) (same).

## VI. FEDERAL QUESTION JURSIDICTION

13          13.    Plaintiff's claims arise from his participation in two deferred compensation

14    plans, the "Long Term Cash Bonus Plan" (LTIPA) and the "Deferral Into Funds Plan" (DIF)

15    (collectively, "the Plans.") Plaintiff alleges he is entitled to compensation under the two Plans. *See*

16    **Exhibit A**, ¶¶ 1-3, 15-16, 24-54.

17          14.    ERISA broadly defines the terms "employee pension benefit plan" and

18    "pension plan" to include any plan established or maintained by an employer that, by its express

19    terms: "results in a deferral of income by employees for periods extending to a termination of

20    covered employment or beyond, regardless of the method of calculating the contributions made to

21    the plan, the methods of calculating the benefits under the plan or the method of distributing benefits

22    from the plan." 29 U.S.C. § 1002(2)(A)(ii).

23          15.    In addition, ERISA specifically covers "Top Hat" plans which are defined as:

24    "a plan which is unfunded and maintained by an employer primarily for the purpose of providing

25    deferred compensation for a select group of management or highly compensated employees." 29

26    U.S.C. § 1101(a)(1); *Duggan v. Hobbs*, 99 F.3d 307, 310 (9th Cir. 1996); *Carr v. First Nationwide*

27    *Bank*, 816 F. Supp. 1476, 1486 (N.D. Cal. 1993).

28          16.    The Plans upon which Plaintiff bases his claims satisfy ERISA's definition

LITTLER MENDELSON, P.C.
650 California Street
20th Floor
an Francisco, CA 94108.2693
415.433.1940

NOTICE OF REMOVAL TO FEDERAL COURT      4.

because they are unfunded and maintained by Defendants primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees. *See* Exhibits 1 and 2 to Plaintiff's Complaint (**Exhibit A**).

17. Top Hat plans are governed by ERISA's enforcement provision setting out the exclusive means for a participant to enforce their rights under a plan. *See Grigg v. Griffith Co.*, 2014 U.S. Dist. LEXIS 3336, at *11 (E.D. Cal., Jan. 9, 2014) (citing *Garratt v. Knowles*, 245 F.3d 941, 946 n.4 (7th Cir. 2001)). ERISA's enforcement provision provides that a civil action may be brought by a participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

18. A plaintiff is preempted from bringing state law claims which "relate to" an ERISA-regulated benefit plan. *Winterrowd v. American General Annuity Insurance Co.*, 2003 U.S. App. LEXIS 3893, at *6 (9th Cir. 2003). "If a claim alleges a denial of benefits, ERISA preempts it." *Smith v. Southwestern Bell Telephone Company*, 2003 U.S. Dist LEXIS 511, at *6 (N.D. Cal. 2003) (emphasis added). The United States Supreme Court in *District of Columbia v. Greater Washington* explained as follows:

> We have repeatedly stated that a law 'relates to' a covered employee benefit plan for purposes of section 514(a) 'if it has a connection with or reference to such a plan.' . . . This reading is true to the ordinary meaning of 'relate to' . . . and thus gives effect to the 'deliberately expansive' language chosen by Congress. . . . Under section 514(a), ERISA pre-empts any state law that refers to or has a connection with covered benefit plans . . .'even if the law is not specifically designed to affect such plans, or the effect is only indirect.' . . . and even if the law is consistent with ERISA's substantive requirements.

506 U.S. 125, 129-30 (1992) (all internal citations and footnote omitted); *accord, Joanou v. Coca-Cola Co.*, 26 F.3d 96, 99 (9th Cir. 1994); *Greany v. Western Farm Bureau Life Ins. Co.*, 973 F.2d 812, 817 (9th Cir. 1992). A plaintiff does not have to make a reference to "ERISA" for a claim to be preempted. *Tingey v. Pixley-Richards West, Inc.*, 953 F.2d 1124, 1130 (9th Cir. 1992).

19. The Supreme Court and Ninth Circuit have routinely held that state law claims related to ERISA plans, including the same types of claims alleged by Plaintiff here, are preempted

LITTLER MENDELSON, P.C.
650 California Street
20th Floor
-an Francisco, CA 94108.2693
415.433.1940

NOTICE OF REMOVAL TO FEDERAL COURT

5.

by ERISA. *See, e.g., Bast v. Prudential Ins. Co. of Am.*, 150 F.3d 1003, 1007-08 (9th Cir. 1998) (state law tort and contract claims); *Nevill v. Shell Oil Co.*, 835 F.2d 209, 212 (9th Cir. 1987) (breach of contract, fraud, breach of the covenant of good faith and fair dealing).

20.    Each of Plaintiff's claims in the Complaint are dependent on the terms and conditions of the Plans, based entirely on Defendants' alleged obligations under those Plans, and cannot exist independently of the Plans. Consequently, Plaintiff's claims are preempted by ERISA.

## VII.    CONCLUSION

**WHEREFORE**, Defendants hereby remove this action from the Superior Court of the State of California, County of San Francisco, to the United States District Court, Northern District of California, and request that this Court retain jurisdiction for all further proceedings.

Dated: May 14, 2014

/s/ Andrew M. Spurchise
GARRY G. MATHIASON
ANDREW M. SPURCHISE
LITTLER MENDELSON, P.C.
Attorneys for Defendants
ALLIANZ ASSET MANAGEMENT OF
AMERICA L.P., ALLIANZ ASSET
MANAGEMENT OF AMERICA LLC and
ALLIANZ GLOBAL INVESTORS U.S. LLC

Firmwide:126816245.4 054881.1041

LITTLER MENDELSON, P.C.
650 California Street
20th Floor
an Francisco, CA 94108.2693
415.433.1940

NOTICE OF REMOVAL TO FEDERAL COURT                6.

# Exhibit A

SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

**FOR COURT USE ONLY**
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

ALLIANZ ASSET MANAGEMENT OF AMERICA L.P., a Delaware
limited partnership, (Additional Parties Attachment Form is attached)

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

Seung Minn

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: *(El nombre y dirección de la corte es):* Civic Center Courthouse 400 McAllister St. San Francisco, CA 94102 | CASE NUMBER: *(Número del Caso):* **CGC-14-538538** |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: *(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es)*

**BY FAX**

Ryan L. Hicks, Hoyer & Associates, 4 Embarcadero Ctr., Suite 1400, 415.766.3539

| DATE: *(Fecha)* **APR 09 2014** | CLERK OF THE COURT | Clerk, by *(Secretario)* **Victoria Gonzalez** | , Deputy *(Adjunto)* |
|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. [ ] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify):*

3. [X] on behalf of *(specify):* Allianz Asset Management of America L.P.

under: [ ] CCP 416.10 (corporation)    [ ] CCP 416.60 (minor)
[ ] CCP 416.20 (defunct corporation)    [ ] CCP 416.70 (conservatee)
[X] CCP 416.40 (association or partnership)    [ ] CCP 416.90 (authorized person)
[ ] other *(specify):*

4. [ ] by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courtinfo.ca.gov*

SUM-200(A)

| SHORT TITLE:<br>_ Minn v. Allianz Asset Management of America L.P. et al. | CASE NUMBER:<br>CGC-14-538538 |
|---|---|

## INSTRUCTIONS FOR USE

➔ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

➔ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.):*

☐ Plaintiff   ☑ Defendant   ☐ Cross-Complainant   ☐ Cross-Defendant

Allianz Asset Management of America LLC, a Delaware limited liability company, Allianz Global Investors U.S. LLC, a Delaware limited liability company, and DOES 1-25

Page _____ of _____

**Page 1 of 1**

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

1 HOYER & ASSOCIATES
Richard A. Hoyer (SBN 151931)
2 rhoyer@hoyerlaw.com
Ryan L. Hicks (SBN 260284)
3 rhicks@hoyerlaw.com
4 Embarcadero Center, Suite 1400
4 San Francisco, CA 94111
*tel* (415) 766-3539
5 *fax* (415) 276-1738

6 Attorneys for Plaintiff
SEUNG MINN

7

ENDORSED
F I L E D
San Francisco County Superior Court

APR 09 2014

CLERK OF THE COURT
BY: VICTORIA GONZALEZ
Deputy Clerk

8 SUPERIOR COURT OF CALIFORNIA

9 IN AND FOR THE COUNTY OF SAN FRANCISCO

10

11 SEUNG MINN,

12              Plaintiff,

13     vs.

14 ALLIANZ ASSET MANAGEMENT OF
AMERICA L.P., a Delaware limited
15 partnership, ALLIANZ ASSET
MANAGEMENT OF AMERICA LLC, a
16 Delaware limited liability company,
ALLIANZ GLOBAL INVESTORS U.S. LLC,
17 a Delaware limited liability company, and
DOES 1-25,

18              Defendants,

19

20

Case No. **CGC-14-538538**

**COMPLAINT FOR BREACH OF
CONTRACT, FAILURE TO PAY
WAGES OWED, WAITING TIME
PENALTIES, AND CONVERSION**

**DEMAND FOR JURY TRIAL**

BY FAX

21     Plaintiff SEUNG MINN ("Plaintiff" or "Minn") brings this action against Defendants

22 ALLIANZ ASSET MANAGEMENT OF AMERICA L.P., ALLIANZ ASSET MANAGEMENT

23 OF AMERICA LLC, ALLIANZ GLOBAL INVESTORS U.S. LLC, and DOES 1-25

24 (collectively "Defendants" or "Allianz"). Plaintiff alleges as follows:

**COMPLAINT**                                                                          1

## **INTRODUCTION**

1.    Plaintiff Seung Minn worked for the company now owned by Defendants for almost fifteen years. During his employment, Minn worked his way up the corporate ladder to hold the positions of Managing Director, Senior Portfolio Manager, and Chief Investment Officer of Defendants' Disciplined Equities Group. Minn performed exceptionally throughout his career with Defendants and their predecessors.

2.    As a high-ranking executive, Minn was required by Defendants to defer a substantial amount of his annual compensation each year into two mandatory incentive plans, Defendants' "Long Term Cash Bonus Plan" ("LTIPA," attached hereto as Exhibit 1 and incorporated by reference) and its "Deferral Into Funds Plan" ("DIF," attached hereto as Exhibit 2 and incorporated by reference). Under the plans, Minn was entitled to a payout of that deferred compensation, so long as he was not terminated for "Cause," as defined in a substantially identical fashion in each of the two plans.

3.    During October 2013, Defendants terminated Minn. However, Defendants' grounds for terminating Minn, even if true, did not constitute "Cause" as defined in the LTIPA and DIF, respectively. Nevertheless, in bad faith Defendants characterized Minn's termination as being for "Cause" so that it would not have to pay Minn the substantial compensation to which he was entitled when Defendants made their annual payouts to employees enrolled in the plans for the year 2013. As Defendants terminated Minn without "Cause" as defined under the applicable plans, they breached those two compensation agreements, failed to pay Minn all of the wages that he was owed, and converted substantial wages that it unilaterally deducted from his annual compensation.

//

//

**COMPLAINT**

## PARTIES, JURISDICTION AND VENUE

4.    Plaintiff was first employed by Defendants and their predecessors in 1998, and worked out of their San Francisco, California office from his date of hire up to and through the date that Defendants terminated him. At all times mentioned herein, Plaintiff has been a resident of the State of California. Plaintiff currently resides in Marin County, California. Minn received paychecks from his employer, "Allianz Asset Management," located in Newport Beach, CA.

5.    Defendant ALLIANZ ASSET MANAGEMENT OF AMERICA L.P. is a limited partnership organized under the laws of the State of Delaware. Its headquarters and "nerve center" are located in Newport Beach, CA and it is therefore a citizen of this state for jurisdictional purposes. It employed Plaintiff in its San Francisco office during the relevant time period.

6.    Defendant ALLIANZ ASSET MANAGEMENT OF AMERICA LLC is a limited liability company organized under the laws of the State of Delaware. Its headquarters and "nerve center" are located in Newport Beach, CA and it is therefore a citizen of this state for jurisdictional purposes. It employed Plaintiff in its San Francisco office during the relevant time period.

7.    Defendant ALLIANZ GLOBAL INVESTORS U.S. LLC is a limited liability company organized under the laws of the State of Delaware. It employed Plaintiff in its San Francisco office during the relevant time period.

8.    Plaintiff is informed and believes, and on that basis alleges that Defendants, and all of them, were Plaintiff's joint employers under California law at all relevant times alleged herein.

//

**COMPLAINT**                                                                                                  3

9.     Plaintiff does not know the true names and capacities of those defendants sued as Does 1-25, and therefore sues those defendants by fictitious names. Plaintiff will amend this complaint to allege their true identities and capacities when ascertained. Plaintiff is informed and believes and on that basis alleges that each of these fictitiously named defendants is responsible in some manner for the occurrences alleged herein and thereby proximately caused Plaintiff's injuries alleged herein.

10.     Plaintiff is informed and believes, and on that basis alleges, that at all relevant times, each of the defendants described herein was the agent or employee of each of the remaining defendants and, in doing the things herein alleged, was acting within the course and scope of such employment, and that defendants authorized, ratified, and approved, expressly or implicitly, all of the conduct alleged herein.

11.     Whenever and wherever reference is made in this Complaint to any act or failure to act by a Defendant or co-Defendant, such allegations and references shall also be deemed to mean the acts and/or failures to act by each Defendant acting individually, jointly and severally.

12.     Venue is proper in the City and County of San Francisco, because the work contemplated in the LTIPA and the DIF was to be performed in San Francisco, because the breach of those agreements occurred in San Francisco, because the facts which caused the violation of the Labor Code occurred in San Francisco, and because Defendants converted Minn's wages in San Francisco.

## FACTUAL ALLEGATIONS

13.     Minn was first hired by the entity now known as Allianz in approximately November 1998 to work in its San Francisco office. Since that time, Minn performed exceptionally, and was steadily promoted from his initial position as a Portfolio Manager, ultimately being

1  elevated in 2010 to the concurrent titles of Managing Director, Senior Portfolio Manager,

2  and Chief Investment Officer of the Disciplined Equities Group.

3  14.     During his time with Defendants, Minn built an asset management business from

4  approximately $300 million to the peak level of $7.4 billion (Q1 2012) to roughly $3.8 billion

5  in institutional and mutual funds assets at the time of his termination. During his tenure,

6  Minn's investments have outperformed the S&P 500 benchmark by approximately 300

7  basis points ("bps") annualized.

8  15.     Approximately nine years ago, Defendants informed Minn that he was being enrolled

9  in the mandatory LTIPA and that a portion of his annual compensation would be deducted

10  each year and deposited into that plan. Defendants did not provide Minn with a copy of the

11  LTIPA when it enrolled him. Defendants did not disclose the terms and conditions of the

12  plan to Minn prior to enrolling him. Minn did not have an opportunity to opt out of the LTIPA,

13  or to withdraw his deferred compensation from that plan. Minn was not permitted to

14  negotiate any terms of the mandatory plan. Minn did not sign any documents consenting to

15  participate in the plan, nor did he acknowledge or consent to any forfeiture provisions

16  contained in the plan. Defendants informed Minn only that the plan was mandatory, and

17  that the amount deducted from his compensation would be paid three years later based on

18  a multiplier that Defendants calculated at the end of the three year period. Thereafter, as

19  the Defendants deferred a part of Minn's compensation into the LTIPA plan each year,

20  starting from the fourth year, Minn received payments each year under the LTIPA, which

21  constituted a substantial portion of his annual compensation.

22  16.     During the end of 2012, Defendants informed Minn that he was being enrolled in

23  another mandatory plan effective early 2013, the DIF, and that a half of the intended LTIPA

24  deduction would now go to the DIF plan. Defendants did not provide Minn with a copy of

COMPLAINT                                                                          5

1  the DIF when it enrolled him. Defendants did not disclose the terms and conditions of the

2  plan to Minn prior to enrolling him. Minn did not have an opportunity to opt out of the plan,

3  or to withdraw his deducted compensation from the plan. Minn was not permitted to

4  negotiate any terms of the mandatory plan. Minn did not sign any documents consenting to

5  participate in the plan, nor did he acknowledge or consent to any forfeiture provisions

6  contained in the plan. Defendants informed Minn only that the plan was mandatory.

7  17.    On September 4, 2013, during a meeting with two subordinates, Minn was in

8  involved in a heated discussion with the subordinate regarding the serious error she made

9  when handling a client's funds withdrawal request. During the meeting, Minn moved her

10  notebook back and forth on the table to demonstrate that he had to keep pushing her to do

11  better and stop making mistakes and errors. During this gesturing, the notebook slipped out

12  of Minn's hand, landed on the subordinate's lap, and startled the subordinate. The startled

13  subordinate then bumped the rolling chair she was sitting in into the glass wall of the office

14  behind her, which made a loud noise. Immediately after the meeting, Minn went to the

15  subordinate's office and apologized for startling her. As the matter had been resolved, Minn

16  and the subordinate continued to go about their work, with no change in their professional

17  working relationship.

18  18.    During the following week, Minn learned that someone had complained about the

19  incident to Defendants' human resources ("HR") department. Thereafter, Minn sent

20  numerous emails to Jami Weinman, Defendants' Director of HR, attempting to determine

21  what the complaints were, if any, to clarify any misunderstandings, and offer his

22  cooperation to resolve any issues. Eventually, a meeting was set for September 18, 2013.

23  19.    At the September 18 meeting, Minn and Weinman were joined by David Owen,

24  Defendants' Chief Legal Officer, and (by telephone) Scott Migliori, Minn's supervisor and

**COMPLAINT**                                                                    6

1  the Chief Investment Officer of U.S. Equity. During the meeting, Owen and Weinman

2  instructed Minn to work remotely, while Owen and Weinman conducted an "investigation"

3  into the incident. Minn complied and asked if there was anything that he could do to assist

4  in the investigation.

5  20.    On October 4, 2013, Weinman instructed Minn to continue to work remotely so that

6  she could report her "findings" to Migliori and Andreas Utermann, Migliori's supervisor and

7  the global Chief Investment Officer of Allianz Global Investors.

8  21.    During this entire time period, Minn continued to perform his duties and

9  responsibilities, including a business trip to Europe to meet with current and prospective

10  clients, and regular interactions with the subordinate involved in the September 4 incident.

11  That subordinate showed no signs of having any issues with Minn during any of the at least

12  twenty interactions between the two following the September 4 incident, many of which

13  were one-on-one and/or face-to-face meetings.

14  22.    On October 11, 2013, Weinman set a meeting with Minn to come into the office on

15  Monday, October 14 at 7:00 a.m. At the October 14 meeting, Migliori terminated Minn.

16  Defendants did not provide any documentation of the termination to Minn at that time or

17  thereafter. When Minn asked why he was being terminated, he was for the first time notified

18  that Defendants were characterizing his termination as one made for "cause," based upon a

19  "violation of firm policy," "potential liability to the organization," and/or "a pattern of conduct

20  detrimental to the organization." Migliori then informed Minn that based on that

21  characterization, Minn would not receive his pending payments from the LTIPA derived

22  from deductions from Minn's compensation for the years 2010 through 2012, or his payout

23  under the DIF based on a 2012 deduction.

24  23.    Prior to his termination, Defendants had never disciplined Minn for any "pattern" of

**COMPLAINT**                                                                                            7

1    inappropriate conduct or for any of the other proffered reasons for his termination during the

2    entirety of his fifteen-year tenure with the Defendants. Nor was any discipline for such

3    conduct contained in any of Minn's evaluations or anywhere in his personnel file.

4    24.    On October 22, 2013 in response to Minn's request of October 16, 2013, Defendants

5    provided a copy of the LTIPA document to Minn for the first time. This was the first time that

6    the full terms and conditions of the LTIPA were disclosed to Minn. The LTIPA includes a

7    forfeiture provision for the funds deducted from an employee's compensation in the event

8    that the employee is terminated for "Cause" as specifically defined in §2 of the plan. (Ex. 1,

9    at p. 2). The LTIPA also provides that if an employee is involuntarily terminated without

10    "Cause," then the employee will still receive a payout based on the date of the involuntary

11    termination and a payoff formula included in the LTIPA document, subject to a requirement

12    that the employee execute a release of all claims and "other documents" including

13    agreements relating to "non-competition, non-solicitation, confidentiality and cooperation."

14    (Exhibit 1, §7(c), (i)).

15    25.    On November 6, 2013, through counsel, Minn demanded the payment of the wages

16    owed to him under the LTIPA and DIF plans, demanded current copies of each plan

17    (Defendants had still never provided a copy of the DIF to Minn), and requested information

18    regarding any claims procedures applicable to either plan. The request for claims

19    procedure documentation was repeated on multiple occasions thereafter, but Defendants

20    have never provided any such documentation regarding any claims procedure applicable to

21    the LTIPA.

22    26.    On December 6, 2013, Defendants' counsel provided to Minn a current copy of the

23    DIF. This was the first time that the DIF plan was provided to Minn. The DIF contains an

24    essentially identical definition of "Cause" (Ex. 2, at pp. 3-4, §1.1), and a substantially similar

forfeiture provision. (Ex. 2, at p. 8, §8.1). In the event the employee is terminated without cause, he is entitled to a payout equal to the value of the assets in the DIF account as of the termination date. (Ex. 2, at p. 8, §8.2).

27.     On December 11, 2013, and on multiple occasions thereafter through counsel, Minn again asserted that he was entitled to the LTIPA and DIF payouts as wages owed under the Labor Code.

28.     As of the date of this filing, Defendants have not paid Minn any portion of the payouts he is owed under the LTIPA and/or the DIF.

**FIRST CAUSE OF ACTION**

**BREACH OF CONTRACT – LTIPA**

29.     Plaintiff re-alleges and fully incorporates herein each and every allegation of the preceding paragraphs.

30.     Plaintiff entered into a mandatory contract, the LTIPA (entitled "The Allianz Global Investors Long Term Cash Bonus Plan, *see* Ex. 1) with Defendants that specified that so long as he was not terminated for "Cause" as specifically defined therein (Ex. 1, at p. 2, §2), he would be entitled to an annual compensation payment at each year's end based on a multiplier, or "Target Achievement Factor", being applied to the "contributions" to the plan unilaterally deducted from his annual compensation during each of the three prior qualifying years. Plaintiff is informed and believes, and on that basis alleges that the multipliers for the year 2013 have been determined, and that Defendants have made payments to its employees enrolled in the LTIPA for the year 2013.

31.     Plaintiff performed his duties under the LTIPA in a satisfactory manner and was entitled to a payment thereunder following his termination. At no time did Plaintiff engage in any conduct that could be characterized as "Cause" for termination as defined in the §2 of

1   the LTIPA.

2   32.   On October 14, 2013, Defendants terminated Minn and improperly characterized

3   that termination as being for "Cause," though the conduct which formed the basis for

4   Defendants' terminating Minn did not constitute "Cause" as defined in the LTIPA.

5   Defendants' breached the LTIPA by improperly characterizing Minn's termination as for

6   "Cause" so as not to pay him the payouts to which he is entitled.

7   33.   As a result of Defendants' breach, Plaintiff has suffered damages, as Defendants

8   have refused to pay Minn the compensation under the plan to which he is entitled.

9                           **SECOND CAUSE OF ACTION**

10                          **BREACH OF CONTRACT – DIF**

11  34.   Plaintiff re-alleges and fully incorporates herein each and every allegation of the

12  preceding paragraphs.

13  35.   Plaintiff entered into a mandatory contract, the DIF (entitled "Allianz Global Investors

14  Deferral Into Funds Plan (Mandatory)," *see* Ex. 2) with Defendants that specified that so

15  long as he was not terminated for "Cause" as specifically defined therein (Ex. 2, at pp. 3-4,

16  §1.1), he would be entitled to a compensation payment at the end of each deferral period

17  based on the value of the mandatory "contributions" to the plan deducted from his annual

18  compensation. In the event an employee is terminated without "Cause" as defined in the

19  DIF, the employee is entitled to a payout of the value of the assets in the employee's

20  "deferral account" as of the date of the termination.

21  36.   Plaintiff performed his duties under the DIF in a satisfactory manner and was entitled

22  to a payment as of the date of his termination thereunder. At no time did Plaintiff engage in

23  any conduct that could be characterized as "Cause" for termination as defined in the §1.1 of

24  the DIF.

37.     On October 14, 2013, Defendants terminated Minn and improperly characterized that termination as being for "Cause," though the conduct which formed the basis for Defendants' terminating Minn did not constitute "Cause" as defined in the DIF. Defendants' breached the DIF by improperly characterizing Minn's termination as for "Cause" so as not to pay him the value of the assets in his deferral account to which he is entitled.

38.     As a result of Defendants' breach, Plaintiff has suffered damages, as Defendants have refused to pay Minn the compensation under the plan to which he is entitled.

## THIRD CAUSE OF ACTION

## FAILURE TO PAY EARNED WAGES

39.     Plaintiff re-alleges and fully incorporates herein each and every allegation of the preceding paragraphs.

40.     At all times relevant to this Complaint and during Plaintiff's tenure of employment with Defendants, a substantial portion of Plaintiff's total compensation as an employee of Defendants included compensation mandatorily deferred into the LTIPA and DIF plans, and yearly payouts from the LTIPA, and at the end of each DIF deferral period. The payouts from each plan were to be made so long as Minn did not voluntarily resign or be terminated for "Cause" as defined in the LTIPA and DIF plans, respectively.

41.     Defendants required Plaintiff to take part in the LTIPA and DIF, and under those agreements Plaintiff would earn an annual payout from those two plans in addition to his regular salary. Plaintiff's participation in the plan was funded by mandatory "contributions" to the plans that were involuntarily deducted from Minn's annual compensation.

42.     Defendants failed and refused to pay Plaintiff all of the wages that he earned working for them as required by the Labor Code and other applicable laws and/or regulations.

**COMPLAINT**                                                                                      11

43.    At all times, Defendants had the ability to pay Plaintiff all wages due but willfully refused to pay Plaintiff his wages after he demanded them. Defendants falsely denied the amount or validity of wages due to Plaintiff. Defendants did this with the intent to secure for themselves the monies that it had unilaterally deducted from his wages during the previous three years.

44.    Plaintiff has been deprived of his rightfully earned wages as a direct and proximate result of Defendants' failure and refusal to pay said compensation. Pursuant to Labor Code §§200 *et seq.*, Plaintiff is entitled to recover such amounts, plus interest thereon, attorneys' fees and costs, and applicable civil and statutory penalties.

## FOURTH CAUSE OF ACTION

### WAITING TIME PENALTIES

45.    Plaintiff re-alleges and fully incorporates herein each and every allegation of the preceding paragraphs.

46.    Labor Code §201 requires an employer who discharges an employee to pay all compensation due and owing at the time of termination, or as soon as it can reasonably be calculated.

47.    Labor Code §203 provides that if an employer willfully fails to pay compensation promptly upon discharge as required by §201, then the employer is liable for waiting time penalties in the form of continued compensation of up to thirty (30) workdays.

48.    Defendants willfully failed and refused to timely pay compensation and wages, including unpaid compensation owed under the LTIPA and DIF plans to Plaintiff upon terminating him, and upon subsequent determination of the 2013 multipliers for the LTIPA plan and final valuation of the DIF plan as of the termination date. Pursuant to Labor Code §§200 *et seq.*, Plaintiff is entitled to recover such amounts, plus interest thereon, attorneys'

1 | fees and costs, and applicable civil and statutory penalties.

2 | ## FIFTH CAUSE OF ACTION

3 | ### CONVERSION

4 | 49. Plaintiff re-alleges and fully incorporates herein each and every allegation of the

5 | preceding paragraphs.

6 | 50. Plaintiff had an absolute right to be paid all wages owed to him, including the

7 | compensation to which he was entitled under the LTIPA and DIF plans, respectively.

8 | 51. Defendants have damaged Plaintiff by their improper characterization of his

9 | termination as being for "Cause," and by the unlawful conversion of wages known to be

10 | owed to Plaintiff.

11 | 52. As a proximate result of Defendants' conversion, Plaintiff is entitled to the return of

12 | the wages that Defendants have converted, in an amount according to proof at the time of

13 | trial.

14 | 53. Plaintiff is further entitled to compensation for the time and money expended in

15 | pursuit of the converted property. On November 6, 2013 and in multiple communications

16 | thereafter, Plaintiff demanded, through counsel, payment of all wages owed to him under

17 | the LTIPA and DIF. To date, Defendants have refused to pay Plaintiff all of the wages that

18 | he is owed.

19 | 54. In committing the acts alleged herein, Defendants acted with oppression, fraud,

20 | malice, ill will, and in conscious disregard of the rights of Plaintiff, and Plaintiff is therefore

21 | entitled to punitive damages in an amount according to proof at the time of trial.

22 | Specifically, Plaintiff's supervisors, Migliori and Utermann, improperly characterized the

23 | termination as for "Cause" without any basis for doing so with the knowledge that the false

24 | characterization would cost Plaintiff substantial compensation to which he was otherwise

1   entitled. Migliori and Utermann acted in this manner due to Minn's continuous truthful

2   comments to Defendants' stakeholders regarding the lack of utility and efficacy of research

3   teams (Global Fundamental Research and Grassroots Research teams) that Migliori and

4   Utermann championed, and demanded that Minn promote such teams both internally and

5   externally. Minn's truthful comments were part of his duties and responsibilities, and caused

6   Migliori and Utermann to lose face with their own superiors and colleagues within

7   Defendants' corporate structure. In retaliation they maliciously mischaracterized Minn's

8   termination specifically to deprive him of the wages to which he was entitled under the

9   LTIPA, the DIF, and the Labor Code.

10                                      **PRAYER FOR RELIEF**

11          WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

12          1.      For compensatory damages according to proof at time of trial;

13          2.      For general damages according to proof at time of trial;

14          3.      For consequential damages, according to proof at time of trial;

15          4.      For exemplary and punitive damages;

16          5.      For an order directing Defendants to pay Plaintiff all wages owed under the

17                  LTIPA and DIF plans;

18          6.      For penalties pursuant to Labor Code §203;

19          7.      For reasonable attorneys' fees and costs pursuant to Labor Code §218.5;

20          8.      For a declaratory judgment finding that Plaintiff was not terminated for

21                  "Cause" as defined under the LTIPA or the DIF;

22          9.      For prejudgment interest to the extent permitted by law; and

23   //

24   //

**COMPLAINT**                                                                    14

1        10.     For such other and further relief as the Court may deem proper.

2                      **DEMAND FOR JURY TRIAL**

3        Plaintiff hereby demands a jury trial on all causes of action and claims to which they

4 have a right to jury trial.

5

6 Date: April 9, 2014                         HOYER & ASSOCIATES

7

8                                      Ryan L. Hicks

                                     Attorneys for Plaintiff

9                                      SEUNG MINN

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**COMPLAINT**                                                            15

# EXHIBIT 1

## THE ALLIANZ GLOBAL INVESTORS LONG TERM CASH BONUS PLAN (LTIPA)
### (As Amended and Restated as of January 1, 2011)

**Section 1.** *Purposes and Effective Date*.  The purpose of the Allianz Global Investors Long Term Cash Bonus Plan is to provide long-term incentives and rewards to certain key staff and executives of Allianz Global Investors AG, Munich (the "*Group*") and its subsidiaries and certain affiliates in order to promote the Allianz Global Investors Group's long-term growth and profitability.  This Plan shall be effective for all Awards outstanding and granted as of January 1, 2011, except that Section 6 and the definition of AGI Earnings Factor in Section 2 hereof shall only apply to those awards granted on or after January 1, 2011 (and the version of Section 6 under the Prior Plan shall apply to any awards outstanding as of but granted prior to January 1, 2011).

**Section 2.** *Definitions.*

The following terms used in the Plan have the meanings set forth in this Section 2.

"*AGI Earnings Factor*" means 1.0 plus the percentage change (which may be a positive or negative number) in the aggregate Operating Earnings over the LTIPA Period of those companies and divisions within Allianz Global Investors Group whose employees are eligible to participate in the Plan for such LTIPA Period, expressed as a decimal. Notwithstanding the immediately preceding sentence, the Plan Administrator may from time to time establish an applicable floor value and maximum value for the AGI Earnings Factor in respect of any LTIPA Period with respect to any Controlling Unit, any class of Controlling Units or all Controlling Units whose Target Achievement Factor is or includes the AGI Earnings Factor.

"*Allianz Global Investors Group*" means collectively the Group and all its subsidiaries and affiliates that form one consolidated reporting group as determined by the Plan Administrator.

"*Allianz SE*" means Allianz Societas Europaea, with registered offices in Munich, Germany.

"*Award*" has the meaning set forth in Section 6(a).

"*Base Year*" means, in relation to any LTIPA Period, the fiscal year ended immediately prior to the commencement of the first year in the LTIPA Period.

"*Board*" means the Group's Supervisory Board.

"*Budget Exchange Rate*" has the meaning set forth in Section 6(a).

"*CAGR*" **C**ompounded **A**nnual **G**rowth **R**ate means, when stated in relation to Operating Earnings for any Controlling Unit, the percentage change, stated as a decimal, in such Controlling Unit's Operating Earnings for the Measurement Year as compared to its Operating Earnings for the Base Year, which shall be determined by (i) dividing (A) the Controlling Units' Operating Earnings for the Measurement Year by (B) its Operating Earnings for the Base Year, (ii) raising the quotient derived from subclause (i) to a power of 1/3 and (iii) subtracting one from the result derived from subclause (ii).  Notwithstanding the immediately preceding sentence, the Plan Administrator may from time to time establish an applicable floor value and maximum value for

CAGR in respect of any LTIPA Period with respect to any Controlling Unit, any class of Controlling Units or all Controlling Units whose Target Achievement Factor includes CAGR.

"*CAGR Factor*" means the percentage determined pursuant to the table in Annex C or pursuant to such other table as the Plan Administrator shall establish in advance of the applicable LTIPA Period in respect of any Controlling Unit, any class of Controlling Units or all Controlling Units whose Target Achievement Factor is or includes the CAGR Factor:

"*Cause*" means if the Participant (i) commits an act constituting a felony under the laws of the United States or the laws of any other relevant country or any state or political subdivision of the United States or such relevant country or engages in other illegal conduct that, in the reasonable judgment of the Group either is or, if known to others outside of the Participating Employer, would be detrimental to the business, reputation, character or standing of the Participating Employer or any of its affiliates ("Detrimental");   (ii) violates laws, rules or regulations applicable to banks, investment banks, broker-dealers, investment advisors or the banking and securities industries generally and such violation (A) could subject the Participating Employer or any of its affiliates to any disqualification, sanction, fine, penalty or similar measure of or by any regulatory authority of competent jurisdiction or (B) either is or, if known to others outside the Participating Employer, would be Detrimental; (iii) commits an act constituting gross negligence or willful misconduct in connection with his or her employment and duties; (iv) engages in conduct that violated the Participating Employer's internal policies or procedures and which either is or, if known to others outside of the Participating Employer, would be Detrimental; (v) commits an act of fraud, dishonesty or misrepresentation in connection with his or her employment and duties that either is, or, if known to others outside of the Participating Employer, would be Detrimental; (vi) gives legitimate reason to the Participating Employer to identify a disruption of the mutual trust that is essential to further expect a fruitful cooperation in the fulfillment of his or her employment relationship; (vii) engages in an undisclosed conflict of interest or self-dealing; (viii) willfully (x) impedes, (y) endeavors to influence, obstruct or impede, or (z) fails to materially cooperate with, an investigation authorized by the Participating Employer (an "*Investigation*"), provided, however, that the Participant's failure to waive attorney-client privilege relating to communications with his or her own attorney in connection with an Investigation shall not constitute "*Cause*"; or (ix) is disqualified or barred by any governmental or self-regulatory authority from serving in the capacity contemplated by the Participant's employment with the Participating Employer or loses any governmental or self-regulatory license that is reasonably necessary for the Participant to perform his or her responsibilities to the Participating Employer.

"*Change of Control*" means a change in the ownership or control, within the meaning of Section 409A of the Code and the regulations promulgated thereunder, of any Participating Employer.

"*Code*" means the U.S. Internal Revenue Code of 1986, as amended.

"*Controlling Unit*" means a Participating Employer or group of Participating Employers as determined by the Plan Administrator.

"*Controlling Unit Earnings Factor*" means 1.0 plus the percentage change (which may be a positive or negative number) in the aggregate Operating Earnings over the LTIPA Period of the Controlling Unit for such LTIPA Period, expressed as a decimal. Notwithstanding the immediately preceding sentence, the Plan Administrator may from time to time establish an

applicable floor value and maximum value for the Controlling Unit Earnings Factor in respect of any LTIPA Period with respect to any Controlling Unit, any class of Controlling Units or all Controlling Units whose Target Achievement Factor is or includes the Controlling Unit Earnings Factor.

"*Disability*" means, with respect to a Participant, a determination by the Plan Administrator that such Participant has become "disabled" within the meaning of the applicable Participating Employer's long-term disability plan then in effect.

"*Early Retirement*" means voluntary termination on or after the Participant's 55th birthday, but subject to the satisfaction of such additional conditions as the Plan Administrator may, in its discretion. impose, including, but not limited to, a requirement that the Participant enter into an agreement not to compete, directly or indirectly, with his or her Participating Employer and its affiliates for a period of not more than two years following such termination and/or that the Participant execute a release of claims against the Participating Employer by whom the Participant was employed. Notwithstanding the foregoing, with respect to any Participant who is a U.S. taxpayer, no Participant may qualify for Early Retirement unless his or her Participating Employer consents to such retirement.

"*Group*" has the meaning set forth in Section 1.

"*LTIPA Period*" has the meaning set forth in Section 4.

"*Measurement Year*" means, in relation to any LTIPA Period, the last fiscal year in the LTIPA Period.

"*Operating Earnings*" means, for a Controlling Unit, the difference between the operating revenue and operating expense of the companies comprising the Controlling Unit, and for the Group, the aggregate of the Operating Earnings of Allianz Global Investors Group, in each case calculated in a manner determined from time to time by the Plan Administrator. The Group's Operating Earnings, as applied to the calculation of a particular Award, shall be calculated based on currency exchange ratios used by the Group in the respective Allianz Global Investors Group's budget planning process at the time such Award was granted, initially as specified in Annex A hereto with respect to the applicable LTIPA Period.

"*Operating Earnings Achievement Factor*" means the percentage, stated as a decimal, determined by dividing the actual Operating Earnings of the Controlling Unit for the LTIPA Period by the Operating Earnings projected for such Controlling Unit for the LTIPA Period (which projections will be established based on the business plan established prior to the beginning of the LTIPA Period). Notwithstanding the immediately preceding sentence, the Plan Administrator may from time to time establish an applicable floor value and maximum value for the Operating Earnings Achievement Factor in respect of any LTIPA Period with respect to any Controlling Unit, any class of Controlling Units or all Controlling Units whose Target Achievement Factor is or includes the Operating Earnings Achievement Factor.

"*Participants*" has the meaning set forth in Section 5(a).

NY12534:143052.11
23350605v5

"*Participating Employer*" means the Group and each subsidiary or affiliate of the Group, or any unit or division of any of the foregoing, that has been authorized by the Plan Administrator to participate in the Plan and has adopted the Plan.

"*Plan*" means this Allianz Global Investors Long Term Cash Bonus Plan as set forth herein and as in effect from time to time.

"*Plan Administrator*" has the meaning set forth in Section 3(a).

"*Planned Termination*" means a mutual, written contractual agreement between a Participating Employer and a Participant to terminate the employment of a Participant based on criteria and principles that demonstrate an adequate and appropriate business rationale for affording such Participant the benefit of a mutually agreed termination. The written agreement evidencing a Planned Termination shall set forth such terms and conditions as may be agreed at such time by the Participating Employer and the Participant, including, without limitation, a requirement that the Participant execute a release of claims against the Participating Employer by whom the Participant was employed. For the avoidance of doubt, a Planned Termination shall not include a voluntary termination of employment by the Participant or any other termination of the Participant's employment that is initiated by the Participant, other than as a result of a material adverse change in the terms and conditions of the Participant's material terms of employment.

"*Prior Plan*" means the Allianz Global Investors Long Term Cash Bonus Plan as Amended and Restated as of January 1, 2007 and as was in effect from January 1, 2007 through December 31, 2010.

"*Retirement*" means the retirement of a Participant under the terms of an applicable retirement plan or policy of the applicable Participating Employer, provided that such Participant has attained at least age 60 or any later age provided under the terms of the applicable retirement plan or policy of the Participating Employer.

"*Target Achievement Factor*" has the meaning set forth in Section 6(c).

Section 3. *Administration*.

(a) The Plan shall be administered by the Group's Executive Committee (the "*Plan Administrator*"), as constituted from time to time. Notwithstanding anything else in the Plan to the contrary, the Plan Administrator may delegate any or all of its duties, powers and authorities hereunder to any officer, director or employee, or committee or group of officers, directors or employees of any member of the Allianz Global Investors Group (including, without limitation, any of the Participating Employers).

(b) The Plan Administrator shall have complete control over the administration of the Plan and shall have the authority in its sole and absolute discretion to: (i) exercise all of the powers granted to it under the Plan; (ii) construe, interpret and implement the Plan; (iii) prescribe, amend and rescind rules and regulations relating to the Plan, including rules and regulations governing its own operations; (iv) make all determinations necessary or advisable in administering the Plan (including, without limitation, calculating the payments to each Participant); (v) correct any defect, supply any omission and reconcile any inconsistency in the Plan; (vi) amend the Plan to reflect changes in or interpretations of applicable law, rules or

NY12534:143052.11
23350605v5

regulations; and (vii) allocate among its members and delegate to any person who is not a member or to any administrative group within the Group any of its powers, responsibilities or duties. The Plan Administrator may make such adjustments or modifications to the terms of any Award made under the Plan to the extent necessary or appropriate to cause any such Award to comply with the requirements of any law of any jurisdiction applicable in respect to the Participant receiving such Award.

**(c)** The determination of the Plan Administrator on all matters relating to the Plan and any amounts payable thereunder shall be final, binding and conclusive on all parties.

**(d)** No member of the Board or the Plan Administrator or any employee of the Group (each such person, a *"Covered Person"*) shall have any liability to any person (including, without limitation, any Participant) for any action taken or omitted to be taken or any determination made in good faith with respect to the Plan or any Award. Each Covered Person shall be indemnified and held harmless by the Group against and from any loss, cost, liability or expense (including attorneys' fees) that may be imposed upon or incurred by such Covered Person in connection with or resulting from any action, suit or proceeding to which such Covered Person may be a party or in which such Covered Person may be involved by reason of any action taken or omitted to be taken under the Plan and against and from any and all amounts paid by such Covered Person, with the Group's approval, in settlement thereof, or paid by such Covered Person in satisfaction of any judgment in any such action, suit or proceeding against such Covered Person, provided that the Group shall have the right, at its own expense, to assume and defend any such action, suit or proceeding and, once the Group gives notice of its intent to assume the defense, the Group shall have sole control over such defense with counsel of the Group's choice. The foregoing right of indemnification shall not be available to a Covered Person to the extent that a court of competent jurisdiction in a final judgment or other final adjudication, in either case, not subject to further appeal, determines that the acts or omissions of such Covered Person giving rise to the indemnification claim resulted from such Covered Person's bad faith, fraud or willful criminal act or omission.

**Section 4.** *LTIPA Period.* Unless another period is selected by the Plan Administrator, the Plan shall operate for successive three-year periods (each, a *"LTIPA Period"*) commencing on each January 1st and terminating on December 31st three years later. The first LTIPA Period under the Plan as amended and restated shall commence as of January 1, 2011 and shall terminate on December 31, 2013. Additional LTIPA Periods (i.e., for periods other than 2011-2013) may be established as determined by the Plan Administrator from time to time.

**Section 5.** *Participation.*

The Plan Administrator, upon recommendation from management of the Participating Employers, shall designate the employees of the Participating Employers who shall participate in the Plan for each LTIPA Period (the *"Participants"*). The designation of a Participant for one or more LTIPA Periods shall not limit in any way the autonomy of the Plan Administrator to decide against a participation of that employee in the Plan for a subsequent LTIPA Period.

**Section 6.** *Long Term Cash Bonus Awards.*

**(a)** *Awards to Participants.* In connection with and as part of the annual compensation review process, the Plan Administrator (or such other persons or group to which the Plan

NY12534:143052.11
23350605v5

Administrator shall delegate such authority; provided that such delegation may be made subject to the Plan Administrator's approval of the applicable allocations) may issue awards under this Plan to persons designated as Participants for the applicable LTIPA Period (each, an *"Award"*), which shall be expressed as a stated initial notional monetary amount. The Award granted to any Participant shall be denominated in the local currency used by the Controlling Unit employing such Participant to pay compensation to the majority of its Participants, based on a currency exchange rate used for such Controlling Unit in the Allianz Global Investors Group's budget planning process, initially as specified in Annex A hereto with respect to the applicable LTIPA Period (the "*Budget Exchange Rate*"). Notwithstanding the foregoing, the initial notional monetary amounts of the Awards that pertain to the Participants at a Controlling Unit or Participants who are otherwise designated as eligible to participate in a particular incentive pool shall in no event exceed, and shall in all events be debited against, the applicable incentive compensation pool approved by the Board.

**(b)** *Calculation of Awards.* The amount payable in respect of each Award issued shall be determined by multiplying (i) the stated initial notional monetary value of the Award by (ii) the Target Achievement Factor for the applicable Participant's Controlling Unit.

**(c)** *Target Achievement Factor.* The Plan Administrator shall specify whether the Target Achievement Factor for a Controlling Unit is (i) the AGI Earnings Factor, (ii) the CAGR Factor, (iii) the Operating Earnings Achievement Factor, (iv) the Controlling Unit Earnings Factor, or (v) a combination of any two or more of the foregoing objectives, in such percentages as the Plan Administrator shall specify. While the Plan Administrator will have discretion to use any of the measures in (i)-(v) as the Target Achievement Factor, it is expected that, for LTIPA Periods commencing after 2010, a combination of the AGI Earnings Factor and the Controlling Unit Earnings Factor will be used as the Target Achievement Factor in most circumstances. The Plan Administrator shall determine CAGR, the CAGR Factor, the Controlling Unit Earnings Factor and the Operating Earnings Achievement Factor based on the financial reports for the applicable Controlling Unit. Examples of calculations are provided in Annex B with respect to the applicable LTIPA Period.

**(d)** *Payment.* Subject to Section 7, within 90 days after the end of each LTIPA Period, each Participant will receive a payment in cash equal to the computed value of his or her Award (in the currency determined under Section 6(a) above).

**Section 7.** *Termination.*

**(a)** In the event that a Participant's employment with a Participating Employer or any of its affiliates is terminated for Cause prior to payment in respect of any Award, the Participant's entitlement to the Award shall be forfeited as of the date notice of termination is delivered by the Participating Employer to the Participant and no amounts shall be paid in respect of such Award.

**(b)** Except as may otherwise be provided in Section 8, in the event that a Participant's employment with a Participating Employer is terminated prior to the end of the LTIPA Period for any reason other than Early Retirement, Retirement, Planned Termination, involuntary termination by the applicable Participating Employer without Cause, death or Disability and the Participant does not at such time become employed by an affiliate of the Participating Employer, the Participant's entitlement to the Award shall be forfeited as of the date notice of

NY12534:143052.11
23350605v5

termination is delivered to Participating Employer by the Participant and no amounts shall be paid in respect of such Award.

(c) In the event that (A) a Participant's employment with a Participating Employer and its affiliates is terminated due to Early Retirement, Retirement, an involuntary termination by the applicable Participating Employer without Cause or Planned Termination or (B) the Participant becomes employed by an affiliate that is not a Participating Employer prior to the end of the LTIPA Period, the Participant shall be entitled to, if a termination occurs on or before June 30 of the first year of any LTIPA Period, the initial notional monetary value of the Participant's Award, or, in any other case, a portion of the Award equal to the sum of (i) plus (ii) below, where (i) and (ii) are:

(i)    the initial notional monetary value of the Participant's Award

(ii)    the product (which may be a negative number) of (x) and (y) below, where (x) and (y) are:

    (x)    the amount which would have been payable in respect of the Award, as determined in accordance with Section 6(b), assuming that the LTIPA Period ended on the last day of

        (A)    the prior year, if the termination occurs on or before June 30; or

        (B)    the year in which such termination occurs, if the termination occurs on or after July 1,

    in either case minus the initial notional monetary value of the Participant's Award

    (y)    a fraction,

        (A)    the numerator of which is the number of full years performance taken into account for purposes of determining the amount described in subclause (x), and

        (B)    the denominator of which is 3.

To illustrate the foregoing calculation, if during the 2011-2013 LTIPA Period, a Participant retires on June 1, 2012, the LTIPA Period would be deemed to have ended December 31, 2011, and the fraction used to pro-rate the appreciation or depreciation of the Award would be 1/3 (taking only the one full year elapsed, 2011, into account). Were such Participant to retire on July 1, 2012, the LTIPA Period would be deemed to have ended December 31, 2012, and the fraction used to pro-rate the appreciation or depreciation of the Award would be 2/3 (taking both 2011 and 2012 into account, as if both years had been completed).

(d) In the event that a Participant's employment with a Participating Employer and its affiliates is terminated due to death or Disability, the Participant (or the Participant's estate, in the event of death) shall be entitled to receive payment in an amount equal to the initial notional value of the Award determined under Section 6 above.

-7-

(e)   With respect to any Participant who has satisfied, or would during the applicable LTIPA Period be eligible to satisfy, the conditions for Retirement, payment of any Award in accordance with this Section 7 shall be made in the calendar year following the year of termination of employment.

(f)   Except as provided in Section 7(e), payment of any Award in accordance with this Section 7 shall be made as soon as reasonably practicable after the date of the Participant's termination of employment, but in no event later than the March 15 of the calendar year following such termination.

(g)   Notwithstanding anything in this Section to the contrary, the Plan Administrator may elect to award a Participant who retires during a LTIPA Period an additional right in respect of such LTIPA Period to receive an amount at the time that payment would have been made in the ordinary course pursuant to Section 6 equal to the excess of (i) the amount that would have been paid to such Participant had he or she been employed for the entire LTIPA Period (or a percentage of such amount, as determined by the Plan Administrator) over (ii) the amount otherwise payable to the Participant in accordance with this Section 7.

(h)   With respect to any Participant who is employed in the United States or is otherwise treated as subject to income taxation in the United States in respect of an Award payable under the Plan (a "**US Taxpayer**"), (i) such Participant shall not be treated as having incurred a termination of employment for purposes of this Section 7 unless and until such Participant shall have incurred a "separation from service" within the meaning of Section 409A of the Code and the regulations thereunder and (ii) any payment due such Participant in connection with any such separation from service shall not be made earlier than the date which is six months and one day after such separation from service, if such Participant is a "specified employee" of the Group, as determined in accordance with the applicable provisions of Section 409A and the regulations thereunder (taking into account any policies or practices of the Group established in accordance with such regulations).

(i)   With respect to any Participant whose employment is terminated during a LTIPA Period due to an involuntary termination by the Participating Employer, receipt of payment of any Award under Section 7(c) shall be subject to a requirement that the Participant execute (i) a release of claims against the Participating Employer by whom the Participant was employed and (ii) such other documents as the Participating Employer shall specify, including, without limitation, agreements containing covenants pertaining to non-competition, non-solicitation, confidentiality and cooperation, in each case prior to payment by the date set forth in Section 7(f).

**Section 8.**   *Changes of Control and other Reorganizations*

(a)   *Transfers of Employment; Reorganizations*.   In the event that during a LTIPA Period (i) the business structure of a Controlling Unit is reorganized in a way that materially affects the basic facts and circumstances for the original calculation of Awards, e.g. due to a

split into two or more business units that are designated as new Controlling Units by the Plan Administrator, or in case of a transfer of assets under management from one Controlling Unit to another Controlling Unit, or for reason of other significant intra group transactions among Controlling Units, or (ii) a Participant transfers employment from one Controlling Unit to

another Controlling Unit, then the entitlement of an affected Participant to a portion of the value of an Award for the period prior to and after such event shall be determined by the Plan Administrator by making such modifications to the individual Awards as it deems reasonable and practicable in order to best reflect the original intent of the calculation prior to and after the event.

(b) *Changes of Control*. In the event of a Change of Control of any Participating Employer, the Plan Administrator may determine to terminate each outstanding LTIPA Period (but may continue in effect any condition requiring continued service to receive payment of the corresponding Award) or to adjust the determination of the percentage change in the Allianz Global Investors Group's Operating Earnings used for purposes of Section 6(b) in a manner consistent with the change and may make such other adjustments to the calculation of Awards under Section 6 as may be necessary or appropriate as a result of such change; provided, however, that no such action shall cause the amount payable in respect of any Participant's Award to be less than the amount determined under this Section 8(b). Except as otherwise provided below, any amount payable to a Participant in respect of the applicable LTIPA Period shall be paid at the earlier of the time that such amount would otherwise have been payable to the Participant under Section 6 or Section 7; provided that, if in connection with such a Change of Control the Plan Administrator waives the requirement of continued employment to receive payment of such Award, payment shall be made in respect of such Award not later than March 15 of the calendar year following the year in which the Change of Control occurs, except that with respect to a Participant described in Section 7(e), payment will be made at the earlier of the time otherwise specified in Section 6 or Section7(e). Except as otherwise provided herein, the minimum amount payable to a Participant due to a Change of Control shall be equal to, if the Change of Control occurs during the first year of the LTIPA Period, the initial notional value of the Participant's Award, or, in any other case, a portion of the Award equal to the sum of (i) plus (ii) below, where (i) and (ii) are:

(i)    the initial notional monetary value of the Participant's Award

(ii)    the product (which may be a negative number) of (x) and (y) below, where (x) and (y) are:

    (x)    the amount which would have been payable in respect of the Award, as determined in accordance with Section 6(b), assuming that the LTIPA Period ended on the last day of the calendar year preceding the year in which the Change of Control occurs, minus the initial notional monetary value of the Participant's Award

    (y)    a fraction,

        (A)    the numerator of which is the number of full years performance taken into account for purposes of determining the amount described in subclause (x), and

        (B)    the denominator of which is 3.

NY12534:143052.11
23350605v5

Notwithstanding the foregoing, if so doing would result in a greater amount being payable to the Participant than would be payable under the immediately preceding sentence, the Plan Administrator may, in its sole discretion, determine

    (m)    the amount described in subclause (x) of the immediately preceding sentence as though the LTIPA Period ended as of any date during the calendar year in which the Change in Control occurs specified by the Plan Administrator (the "Alternative Date"), so long as the performance against the applicable performance objectives is calculable with reasonably accuracy through the Alternative Date; and/or

    (n)    the numerator of the fraction in subclause (y) of the immediately preceding sentence based on the number of days in the original LTIPA Period elapsed through and including the Alternative Date, and the denominator of such fraction based on the aggregate number of days originally scheduled to occur during the LTIPA Period.

    (c) *Cessation of Participating Employer Status.* Notwithstanding anything to the contrary contained in Section 6(d) or Section 7, if the employer of the Participant ceases to be a Participating Employer by reason of the transaction that constituted the Change of Control, then payments by the Employer in respect of such Participants' Awards shall be made within 90 days of such Change of Control, subject to such continuing employment requirements through the date of such payment as may be established by the Plan Administrator.

### Section 9. *General Provisions.*

    **(a)** *Amendment, Termination, etc.* The Board reserves the right at any time and from time to time to modify, alter, amend, suspend, discontinue or terminate the Plan in any respect whatsoever, including in any manner that adversely affects the rights of Participants, which right may be exercised by duly authorized delegation. In the event that the Plan is terminated, outstanding Awards may be paid at such time and in such manner as determined by the Plan Administrator.

    **(b)** *Nonassignability.* No rights of any Participant under the Plan may be sold, exchanged, transferred, assigned, pledged, hypothecated or otherwise disposed of (including through the use of any cash-settled instrument), either voluntarily or involuntarily by operation of law, other than by will or by the laws of descent and distribution. Any sale, exchange, transfer, assignment, pledge, hypothecation or other disposition in violation of the provisions of this Section 9(b) shall be void. In the event of a Participant's death, any amounts payable under the Plan shall be paid in accordance with the Plan to the Participant's estate. A Participant's estate shall have no rights under the Plan other than the right, subject to the immediately preceding sentence, to receive such amounts, if any, as may be payable pursuant to this Section 9(b), and all of the terms of this Plan shall be binding upon any such Participant's estate.

    **(c)** *Deferral.* Subject to applicable local regulation and the terms of any deferred compensation plan offered by a Participating Employer, Awards are eligible for payment deferral under the terms of such deferred compensation plans or arrangements as may be offered by Participating Employers from time to time, subject to such terms and conditions as may be determined by the Plan Administrator in its sole discretion. Notwithstanding the foregoing, with respect to any person who is or might be a U.S. taxpayer, any such elections shall be structured with the intent of complying with the applicable requirements of Section

-10-

409A of the U. S. Internal Revenue Code (or any successor provisions thereto) and any guidance or regulations promulgated thereunder.

(d) *Plan Creates No Employment Rights.* Nothing in the Plan shall confer upon any Participant the right to continue in the employ of Allianz SE or any of its affiliates for the LTIPA Period or thereafter or affect any right which Allianz SE or any of its affiliates may have to terminate such employment.

(e) *Unfunded.* The Awards are intended to be unfunded for purposes of U.S. federal income tax and shall represent at all times unfunded and unsecured obligations of the Participating Employer to be satisfied solely out of the Participating Employer's general assets subject to the claims of its creditors. Neither a Participant nor his estate shall have any interest in any fund or specific asset of any Participating Employer of any kind by reason of any amount credited to an Award hereunder, nor shall a Participant or his estate or any other person have any right to receive any distribution hereunder as, and to the extent, expressly provided herein.

(f) *Arbitration.* Any dispute, controversy or claim between the relevant Participating Employer and any Participant arising out of or relating to or concerning the provisions of the Plan shall be finally settled by the American Arbitration Association (the "*AAA*") in accordance with the commercial arbitration rules of the AAA. Prior to arbitration, all disputes, controversies or claims maintained by any Participant must first be submitted to the Plan Administrator in accordance with claim procedures determined by the Board in its sole discretion. This Section is subject to the provisions of Section 9(h).

(g) *Choice of Forum.*

(1) **The Participating Employer and each Participant, as a condition to such Participant's participation in the Plan, hereby irrevocably submit to the exclusive jurisdiction of any state or federal court located in the City of New York over any suit, action or proceeding arising out of or relating to or concerning the Plan that is not otherwise arbitrated or resolved according to the provisions of Section 9(f).** This includes any suit, action or proceeding to compel arbitration or to enforce an arbitration award. The Participating Employer and each Participant, as a condition to such Participant's participation in the Plan, acknowledge that the forum designated by this Section 9(g) has a reasonable relation to the Plan and to the relationship between such Participant and the Participating Employer. Notwithstanding the foregoing, nothing herein shall preclude the Participating Employer from bringing any action or proceeding in any other court for the purpose of enforcing the provisions of Sections 9(f) and 9(g).

(2) The agreement by the Participating Employer and each Participant as to forum is independent of the law that may be applied in the action, and the Participating Employer and each Participant, as a condition to such Participant's participation in the Plan (i) agree to such forum even if the forum may under applicable law choose to apply non-forum law, (ii) hereby waive, to the fullest extent permitted by applicable law, any objection which the Participating Employer or such Participant now has or hereafter may have to personal jurisdiction or to the laying of venue of any such suit, action or proceeding in any court referred to in Section 9(g)(1), (iii) undertake not to commence any action arising out of or relating to or concerning this Plan in any forum other than the forum described in this Section 9(g) and (iv) agree that, to the fullest extent permitted by applicable law, a final and non-appealable judgment in any such suit, action

or proceeding in any such court shall be conclusive and binding upon the Participating Employer and each Participant.

(3)     Each Participant, as a condition to such Participant's participation in the Plan, agrees to keep confidential the existence of, and any information concerning, a dispute, controversy or claim described in Sections 9(f) or 9(g), except that a Participant may disclose information concerning such dispute, controversy or claim to the arbitrator or court that is considering such dispute, controversy or claim or to such Participant's legal counsel (provided that such counsel agrees not to disclose any such information other than as necessary to the prosecution or defense of the dispute, controversy or claim).

**(h)** *Governing Law.* **All rights and obligations under the Plan shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to principles of conflict of laws.**

**(i)** *Tax Withholding.* In connection with any payments to a Participant or other event under the Plan that gives rise to a federal, foreign, state, local or other tax withholding obligation (or any similar obligation to withhold and remit payments to an applicable governmental or government identified authority) relating to the Plan (including, without limitation, FICA tax or any similar tax or social charges), (i) each Participating Employer may deduct or withhold (or cause to be deducted or withheld) from any payment or distribution to such Participant whether or not pursuant to the Plan or (ii) the Participating Employer shall be entitled to require that such Participant remit cash (through payroll deduction or otherwise), in each case in an amount sufficient in the opinion of the Participating Employer to satisfy such withholding obligation.

**(j)** *Right of Offset.* Each Participating Employer shall have the right to offset against the obligation to make any payment to any Participant, any outstanding amounts (including, without limitation, travel and entertainment or advance account balances, loans or amounts repayable to each Participating Employer pursuant to other employee programs) such Participant then owes to such Participating Employer.

**(k)** *Severability; Entire Agreement.* If any of the provisions of this Plan is finally held to be invalid, illegal or unenforceable (whether in whole or in part), such provision shall be deemed modified to the extent, but only to the extent, of such invalidity, illegality or unenforceability and the remaining provisions shall not be affected thereby. This Plan shall supersede any other agreement, written or oral, pertaining to the matters covered herein, and to the extent of any inconsistency between this Plan and any prior agreement, this Plan shall prevail.

**(l)** *No Third Party Beneficiaries.* The Plan shall not confer on any person other than the Participating Employer and any Participant any rights or remedies hereunder.

**(m)** *Participating Employers.* Except for purposes of determining the amount of each Participant's Award, this Plan shall be treated as a separate plan maintained by each Participating Employer and, except as provided in the next sentence, the obligation to pay the Award to each Participant shall be the sole liability of the Participating Employer by which the Participant is employed at during the LTIPA Period or during a portion of the LTIPA Period, and neither the Group nor any other Participating Employer shall have any liability with respect

NY12534:143052.11
23350605v5

to such amounts. For purposes of allocating liability between Participating Employers, if a Participant is transferred between Participating Employers, the liability of the initial Participating Employer with whom the Participant was employed at the beginning of the LTIPA Period will be determined as though the Participant had terminated employment with the initial Participating Employer at year-end pursuant to Section 7(c). Any subsequent incremental increase to the value of the Participant's Award shall be the liability of the Participating Employer to which the Participant transferred.

(n) *Successors and Assigns.* The terms of this Plan shall be binding upon, and inure to the benefit of, each Participating Employer and its successors and assigns and each Participant, and in the event of a Participant's death, to the estate of that Participant as provided in Section 9(b).

(o) *Plan Headings.* The headings in this Plan are for the purpose of convenience only and are not intended to define or limit the construction of the provisions hereof.

(p) *Construction.* In the construction of this Plan, the singular shall include the plural, and vice versa, in all cases where such meanings would be appropriate.

IN WITNESS WHEREOF, and as evidence of the restatement of this Plan effective as of January 1, 2011, by [name of Participating Employer], it has caused the same to be signed by its duly authorized officer as of the date first written above.

[NAME OF PARTICIPATING EMPLOYER]

By:_____
Name:
Title:

NY12534:143052.11
23350605v5

<u>Annex A for 2011-2013 LTIPA Period</u>

**Budget 2011 FX Rates**

| | |
|---|---|
| EUR->AUD | 1,42952 |
| EUR->CAD | 1,34359 |
| EUR->CHF | 1,33251 |
| EUR->CNY | 8,75092 |
| EUR->DKK | 7,44976 |
| EUR->GBP | 0,83358 |
| EUR->HKD | 10,04593 |
| EUR->JPY | 110,8435 |
| EUR->KRW | 1528,513 |
| EUR->SGD | 1,75213 |
| EUR->TWD | 41,24347 |
| EUR->INR | 60,07837 |
| EUR->USD | 1,40000 |
| EUR->NOK | 7,95839 |
| EUR->SEK | 9,38135 |
| EUR->NZD | 1,79922 |
| EUR->PHP | 58,45472 |

-14-

<u>Annex B with respect to the applicable LTIPA Period (2011-2013)</u>

## Example: CAGR Factor

| Notional Award Value | | AllianzGI Earnings Factor after 3 Year Period | | Sub-Total | |
|---|---|---|---|---|---|
| 10.000 | + | AllianzGI Operating Earnings Growth at 25% | = | 12.500 | x |

**Multiplied by:**

| | Controlling Unit CAGR Factor after 3 Year Period | | CAGR Multiple | | Total Distribution |
|---|---|---|---|---|---|
| | Controlling Unit CAGR Growth at 10% | = | 1,00 | = | 12.500 |

## Example: Controlling Unit Earnings Factor

| Notional Award Value | | AllianzGI Earnings Factor after 3 Year Period | | Sub-Total |
|---|---|---|---|---|
| 10.000 | + | AllianzGI Operating Earnings Growth at 10% x 1/3 | = | 333 |

**Plus:**

| | Controlling Unit Earnings Factor after 3 Year Period | | | Total Distribution |
|---|---|---|---|---|
| | Controlling Unit Earnings Growth at 40% x 2/3 | = | 2.667 | = | 13.000 |

## Example: Operating Earnings Achievement Factor

| Notional Award Value | | AllianzGI Earnings Factor after 3 Year Period | | Sub-Total | |
|---|---|---|---|---|---|
| 10.000 | + | AllianzGI Operating Earnings Growth at 10% | = | 11.000 | x |

**Multiplied by:**

| | 3 Year Average Plan Target Achievement on Operating Earnings | | Operating Earnings Multiple | | Total Distribution |
|---|---|---|---|---|---|
| | Average Controlling Unit Achievement on Operating Earnings versus Plan Target of 120% | = | 1,20 | = | 13.200 |

## Example: AllianzGI Earnings Factor

| Notional Award Value | | AllianzGI Earnings Factor after 3 Year Period | | Total Distribution |
|---|---|---|---|---|
| 10.000 | + | AllianzGI Operating Earnings Growth at 25% | = | 12.500 |

-15-

<u>Annex C with respect to the CAGR Factors (2011-2013):</u>

1) Pimco:

- Based on CAGR of Operating Earnings, scaled (with linear application between percentages)
- Floor at <= 0% CAGR          0.5
- Cap at >= 12.5% CAGR:        1.25

| CAGR | CAGR Factor |
|------|-------------|
| <= 0% | 50% |
| 5% | 75% |
| 10% | 100% |
| ≥12.5% | 125% |

NY12534:143052.11
23350605v5

EXHIBIT 2

FINAL VERSION

**ALLIANZ GLOBAL INVESTORS**

**RULES OF THE**

**ALLIANZ GLOBAL INVESTORS
DEFERRAL INTO FUNDS PLAN**

**(MANDATORY)**

FINAL VERSION

## CONTENTS

| | | |
|---|---|---|
| 1. | Definitions and Interpretation | 3 |
| 2. | Deferrals | 5 |
| 3. | Payments to Trustee by or on behalf of participating Employers | 6 |
| 4. | Deferral Accounts | 6 |
| 5. | Investment of Deferred Compensation | 6 |
| 6. | Deposit of Funds | 7 |
| 7. | Deferral Periods | 7 |
| 8. | Termination of Employment and Forfeiture of Awards | 8 |
| 9. | Payment of Distributions | 9 |
| 10. | Administration | 9 |
| 11. | Miscellaneous | 12 |

**Appendices - Country Specific Amendments**

| | | |
|---|---|---|
| 1. | Germany | 15 |
| 2. | United Kingdom | 16 |
| 3. | United States | 17 |

FINAL VERSION

# RULES OF THE
# ALLIANZ GLOBAL INVESTORS
# DEFERRAL INTO FUNDS PLAN

This Plan was adopted by Allianz Global Investors GmbH on 7 February 2013. The Plan will be operated as a deferred compensation plan for selected Eligible Employees.

## 1. DEFINITIONS AND INTERPRETATION

### 1.1 Definitions

The following capitalised terms will, for the purposes of the Plan, have the meanings specified below:

**Administrator** means any administrator designated by the Committee to administer the Plan;

**Allianz Group** means Allianz SE and its Subsidiaries;

**Assets** means cash, securities or other assets held for the purpose of the Plan;

**Award** means an award granted to an Eligible Employee under Rule 2;

**Base Salary** of an Employee on a specified date means that Employee's annual fixed salary at the rate in effect on that date;

**Broker** has the meaning set out in Rule 6;

**Business Entity** means a corporation, a business trust or association, a real estate investment trust, a common-law trust, a limited liability company or an unincorporated business, including a general or limited partnership or registered limited liability partnership;

**Cause** means if the Participant (i) commits a criminal offence under the laws of any relevant country or engages in other illegal conduct that, in the opinion of the Committee either is or, if known to others outside of the Participating Employer, would be detrimental to the business, reputation, character or standing of the Participating Employer or any of its affiliates (**Detrimental**); (ii) violates any laws, rules or regulations applicable to banks, investment banks, broker-dealers, investment advisors or the banking and securities industries generally and such violation (A) could subject the Participating Employer or any of its affiliates to any disqualification, sanction, fine, penalty or similar measure of or by any regulatory authority of a competent jurisdiction; or (B) either is or, if known to others outside the Participating Employer, would be Detrimental; (iii) commits an act constituting gross negligence or wilful misconduct in connection with the Participant's employment and duties; (iv) engages in conduct in breach of the Participating Employer's internal policies or procedures and which either is or, if known to others outside of the Participating Employer, would be Detrimental; (v) commits an act of fraud, dishonesty or misrepresentation in connection with the Participant's employment and duties that either is, or, if known to others outside of the Participating Employer, would be Detrimental; (vi) breaches the mutual trust that is essential to the Participant's employment relationship; (vii) engages in an undisclosed conflict of interest or self-dealing; (viii) wilfully impedes, endeavours to influence, obstruct or impede, or fails materially to cooperate with, an investigation authorised by the Participating Employer (an **Investigation**), provided, however, that the Participant's failure to waive attorney-client privilege relating to communications with his or her own attorney in connection with an Investigation will not constitute Cause; or (ix) is disqualified

FINAL VERSION

or barred by any governmental or self-regulatory authority from serving in the capacity contemplated by the Participant's employment with the Participating Employer or loses any governmental or self-regulatory license that is reasonably necessary for the Participant to perform his or her responsibilities to the Participating Employer;

**Committee** means any committee(s) established under Rule 10.1 to administer the Plan;

**Company** means Allianz Global Investors GmbH;

**Compensation** means all variable compensation payable for services rendered during a Plan Year, whenever paid, including Deferred Compensation **but excluding** Base Salary and any compensation attributable to (i) signing or relocation bonuses; (ii) employee benefits, including principal or interest forgiven on loans to any Employee; and (iii) the payment of Distributions under the Plan;

**Deferral Account** means the individual account established for a Participant under Rule 4.1;

**Deferral Period** means the period for which any Compensation of a Participant is Deferred in accordance with Rule 2;

**Deferral Subaccount** means, for any Plan Year, the deferral subaccount of the Participant's Deferral Account for that Plan Year;

**Deferred Compensation** means Compensation mandatorily deferred in respect of a Participant under Rule 2;

**Distribution** means a payment or payments required to be made by the Company or the Trustee under Rule 9;

**Early Retirement** means voluntary termination on or after the Participant's 55th birthday with the Participating Employer's consent but subject to the satisfaction of any additional conditions that the Committee imposes including, but not limited to, a requirement that the Participant enters into an agreement not to compete, directly or indirectly, with the Participant's Participating Employer and its affiliates for a period of not more than two years following termination and/or that the Participant executes a release of claims against the Participant's Participating Employer;

**Eligible Employee** means, for any Plan Year, any Employee who (i) is resident for tax purposes in a jurisdiction in which the Plan is operated; and (ii) whose aggregate Compensation for that Plan Year is greater than EUR 150,000 (or generally consistent thresholds in host country currencies), or such other amounts specified from time to time by the Committee. The Committee may also include Employees with lower aggregate Compensation as Eligible Employees;

**Employee** means any person who is employed by a Participating Employer as an employee or member of an executive body;

**Employer** means, on any date, the Person of which an Employee or a Participant is an Employee;

**Group** means all members of the Allianz Global Investors group, currently being the Company and its Subsidiaries as well as AGI U.S. LLC, Delaware and its Subsidiaries, and **"member of the Group"** will be construed accordingly;

**Investment Accounts** means the accounts which the Trustee maintains pursuant to Rule 6;

**Participant** means an Eligible Employee who has been granted an Award under Rule 2;

**Participating Employer** means the Company and each member of the Group that adopts the Plan in accordance with Rule 11.4;

**Person** means an individual, Business Entity, trust, estate, custodian, nominee or any other entity in its own or any representative capacity;

**Plan** means the Allianz Global Investors Deferral Into Funds Plan (Mandatory) constituted by these Rules;

**Plan Year** means the calendar year;

**Planned Termination** means a written contractual agreement between a Participating Employer and a Participant mutually to terminate the employment of a Participant, which includes a requirement that the Participant executes a release of claims against the Participant's Participating Employer;

**Recordkeeper** means the recordkeeper designated by the Committee to maintain records under the Plan;

**Retirement** means the retirement of a Participant under the terms of an applicable retirement plan or policy of the Participant's Participating Employer, provided that the Participant has reached at least age 60 or any later age provided under the terms of the applicable retirement plan or policy;

**Rules** means these rules of the Plan as adopted by the Company and as amended from time to time in accordance with their terms;

**Specified Funds** means the open ended mutual funds, money market funds and other funds specified by the Committee from time to time that Deferred Compensation may be invested in under the Plan;

**Subsidiary** means a subsidiary within the meaning of section 1159 of the UK Companies Act 2006, as amended, or within the meaning of any other applicable local law or practice;

**Trust** means any trust established and maintained by any member of the Group which operates in conjunction with the Plan;

**Trustee** means the trustee or trustees of any Trust; and

**Unforeseen Emergency** has the meaning set out in Rule 7.2.

**1.2 Interpretation**

In the Rules:

1.2.1    the masculine will include the feminine, and where the context indicates or requires, the singular will include the plural;

1.2.2    the Rule headings are for convenience only and will not serve as a basis for interpretation or construction of the Rules; and

1.2.3    references to a statute, regulation or document will be construed as referring to any subsequently enacted, adopted or executed statute, regulation or document.

**2.    DEFERRALS**

The Committee or a Participating Employer may determine that a percentage of an Eligible Employee's Compensation for any Plan Year will be deferred and made the subject of an Award.

FINAL VERSION

The terms and conditions of each Award and, in particular, the Deferral Period, will be determined by the Participating Employer at the time of the grant of the Award and will be notified in writing to the relevant Eligible Employee. An Award will be structured to take effect as a contract subject to the terms of the Plan between the Participating Employer and the relevant Participant.

## 3. PAYMENTS TO TRUSTEE BY OR ON BEHALF OF PARTICIPATING EMPLOYERS

If and to the extent permitted by any applicable law and the Committee, each Participating Employer may pay to the Trustee, directly or through the Company, the amount of any compensation deferred under an Award.

## 4. DEFERRAL ACCOUNTS

### 4.1. Deferral Accounts

The Recordkeeper will establish and maintain for each Participant a Deferral Account, which will consist of the subaccounts provided for in this Rule 4.

### 4.2. Deferral Subaccounts

The Recordkeeper will, for each Plan Year, establish and maintain a Deferral Subaccount for each Participant. A Deferral Subaccount will be notionally: (a) credited with any payments of Compensation deferred for a Participant for the Plan Year and any income realized on the Assets notionally held in the Deferral Subaccount: and (b) debited with any reimbursement or payment of Distributions from the Deferral Subaccount, and any losses realized on the Assets notionally held in the Deferral Subaccount.

### 4.3. Deferral Accounts unencumbered

Unless and to the extent specifically required under any applicable law, neither a Participant's Deferral Account nor the Trustee's Investment Accounts will be liable for the Participant's debts, contracts or engagements, (or the debts, contracts or engagement of the Participant's heirs or successors in interest) or be taken in execution by levy, attachment or garnishment or by any other legal or equitable proceeding, nor will the Participant or the Participant's heirs or successors in interest have any rights to alienate, anticipate, commute, pledge, charge, encumber or assign any potential Distributions in respect of, or any interest in, the Participant's Compensation Deferral Account in any manner whatsoever.

## 5. INVESTMENT OF DEFERRED COMPENSATION

### 5.1. Investment authority of Trustee

Subject to Rule 5.2, the Trustee may invest the Assets in cash or interests in Specified Funds, subject to the restrictions set out in Rule 5.4, after taking into account the recommendations of the Committee.

### 5.2. Participant's expression of preferences

Subject to, and except to the extent inconsistent with, the requirements and limitations of any applicable law, the Committee may take into account any expression of preferences made by a Participant with respect to the investment of a Participant's Award, subject to any restrictions the Committee may prescribe. For the avoidance of doubt, the Committee will not be bound to accept any such expression of preferences.

### 5.3. Fees and Commissions

Any fees, commissions and other charges of the Broker will be charged against the assets held by the Trustee.

### 5.4. Restrictions on Investment Accounts

5.4.1 Unless the Committee or the Administrator otherwise prescribe:

(A) the Trustee may hold only cash or interests in Specified Funds, subject to any minimum investment in respect of any Specified Fund; and

(B) the Trustee may not execute any transaction (other than a buy order against available funds, or funds to be received from one or more contemporaneous sell orders at market), and may not own any security or other interest, which could, in either case, result in a future demand for cash or collateral from the assets held by the Trustee or the contribution of additional cash to the Trustee.

5.4.2 If permitted under Rule 5.2 a Participant may express a preference for the investment of the Participant's Award during the investment periods in each calendar quarter determined and notified to Participants by the Committee. For these purposes, the automatic reinvestment of dividends, distributions and interest will not be considered a transaction.

5.4.3 The Committee may prescribe different or additional restrictions on holdings and trading in Deferral Accounts and Investment Accounts.

### 5.5. No liability for investments

None of the Company, any Participating Employer, the Committee or the Trustee will have any liability for any losses incurred in respect of any Deferral Accounts or Investment Accounts.

### 5.6 Obligations of the Company

Notwithstanding any Rule of the Plan, nothing in the Plan will oblige the Company or any Participating Employer to establish a Trust or to contribute any assets to a Trust. The Company will decide whether or not a Trust will be established to operate in conjunction with the Plan. The Company will decide whether or not to make any investments or to deposit any assets in connection with an Award or to establish any other source of funds to assist in the meeting of its or the other Participating Employers' respective liabilities under the Plan. If no assets are deposited with a Trustee in relation to a Deferral Subaccount, any Distribution to be made to the relevant Participant will be in an amount equal to the nominal amount of the Deferral Subaccount.

## 6. DEPOSIT OF FUNDS

Subject to compliance with, and except as may be limited or prohibited by any applicable law, the Trustee will deposit with a discount broker of good reputation or the fund administrator of the Specified Funds (the **Broker**), in one or more investment accounts in the name of the Trustee, the cash held in the Trust for the purposes of the Plan.

## 7. DEFERRAL PERIODS

### 7.1. Deferral Periods

FINAL VERSION

Compensation for a Plan Year will be deferred for the full Deferral Period. Except as provided in the Rules, Distributions to a Participant in respect of an Award may not be accelerated.

### 7.2. Unforeseen emergencies

If the Committee determines that a Participant has suffered severe financial hardship resulting from a sudden and unexpected illness or accident affecting the Participant or a dependent of the Participant, the loss of the Participant's property, or other similar extraordinary and unforeseeable circumstances arising as a result of events beyond the control of the Participant (each, an "Unforeseen Emergency"), the Committee may, following a request from the Participant, but only to the extent required to mitigate the Participant's hardship and to pay any taxes on any payments made pursuant to this provision: (i) reduce the Deferral Periods applicable to one or more Plan Years for which Compensation was deferred in respect of the Participant; or (ii) permit an early Distribution to the Participant. Reduction of a Deferral Period or early payment may only be authorized by the Committee if and to the extent that the Participant's hardship cannot be relieved: (i) through reimbursement or compensation by insurance or otherwise; or (ii) by liquidation of the Participant's other assets, to the extent that liquidation of such assets would not itself cause severe financial hardship.

## 8.   TERMINATION OF EMPLOYMENT AND FORFEITURE OF AWARDS

### 8.1. Termination for Cause

If a Participant's employment with a Participating Employer is terminated for Cause before any Distribution in respect of an Award, the Participant's entitlement to the Award will be immediately forfeited in its entirety as of the date notice of termination is delivered by the Participating Employer to the Participant and no Distributions will be paid in respect of the Award.

### 8.2. Good leaver termination

If a Participant's employment with a Participating Employer is terminated due to Early Retirement, Retirement, an involuntary termination by the Participant's Participating Employer without Cause or a Planned Termination before Distribution of the Award, the Participant will be entitled to a Distribution equal to the value of the Assets in the Participant's Deferral Account on or around the last day of the Participant's employment. For this purpose, the Trustee will instruct the Broker to sell those Assets in the Investment Account which are allocated by the Recordkeeper to the relevant Participant on or around the last day of the Participant's employment.

If a Participant becomes employed by a member of the Allianz Group before Distribution of the Award, the Award will continue unaffected and be Distributed in the normal course.

### 8.3. Termination due to death or disability

If a Participant's employment with a Participating Employer is terminated due to death or disability, the Participant (or the Participant's estate, in the event of death) will be entitled to receive a Distribution equal to the value of the Assets in the Participant's Deferral Account within thirty (30) days of the date of termination. For this purpose, the Trustee will instruct the Broker to sell those Assets in the Investment Account which are allocated by the Recordkeeper to the relevant Participant as soon as reasonably practicable.

### 8.4. Other termination

Except as may otherwise be provided in this Rules, if a Participant's employment with a Participating Employer is terminated before the end of the Deferral Period for any reason other than the reasons

FINAL VERSION

set out in Rules 8.1 to 8.3 above, the Participant's entitlement to the Award will be forfeited in its entirety as of the date notice of termination is delivered and no Distributions will be paid in respect of the Award.

### 8.5. Participating Employer leaving the Group

Notwithstanding anything to the contrary contained in these Rules, Distribution of the Participant's Award will be made within 90 days of the Participating Employer ceasing to be a member of the Group and where the Participant does not continue to be employed by another Participating Employer of the Group, subject to any continuing employment requirements through the date of payment determined by the Administrator. If a Participating Employer ceases to be a member of the Group but remains a member of the Allianz Group, the Committee will decide in its discretion whether the relevant Awards will continue unaffected or be distributed to the relevant Participants.

## 9. PAYMENT OF DISTRIBUTIONS

### 9.1. Normal Distributions

On or around the last day of the Deferral Period applicable to an Award, the Participant's Participating Employer or the Company will either;

9.1.1. if Assets with respect to the Award were held by the Trustee (i) instruct the Trustee to sell those assets in the Investment Account which are allocated by the Recordkeeper to the relevant Partcipant and (ii) pay, or direct the Trustee to pay, to the Participant the proceeds of such sale; or

9.1.2. if no Assets with respect to the Award were held by the Trustee pay to the Participant an amount equal to the value of the Assets held in the Participant's Deferral Subaccount at the last date of the relevant Deferral Period (or the last practicable business day of the relevant Deferral Period).

### 9.2. Distributions to be paid in cash

Except as otherwise provided in this Rule 9.2, all Distributions will be paid in cash. Participants will have no right to receive any Assets held by the Trustee. Should the Trustee and/or the Broker for any reason not be able to produce the required funds in the Investment Accounts by selling the respective Assets, the Trustee and/or the Broker will use reasonable commercial efforts to sell these Assets and to effect the Distribution as soon as possible.

### 9.3. Distributions subject to deduction and withholding

Payment of any Distributions under the Plan will be made subject to any deductions or withholdings required by law to be made. The Company, the Trustee or any Participating Employer may deduct or withhold any amount and make any arrangements it considers necessary or appropriate to meet any liability of a Participant to taxation or social security contributions in connection with the Distributions made under the Plan.

## 10. ADMINISTRATION

### 10.1. The Committee

10.1.1 A Committee will be established to administer the Plan on behalf of the Participating Employers. The members of the Committee will be appointed and may be removed at any time by the Management Board of the Company.

10.1.2 The Committee will, on behalf of the Participating Employers, act by a majority of its members in office, either at a meeting or by a written instrument executed by a majority of the Committee members. The Chairperson of the Committee can execute any instrument required to be executed by the Committee. The Committee will appoint an Administrator, who may be a single individual or a committee of several individuals or a Business Entity. Unless otherwise expressly provided by the Committee in written directions to any Administrator, the Administrator will have the power and authority, as the agent of the Committee, to exercise any power or discretion afforded to the Committee with respect to the administration and operation of the Plan, including, without limitation, each of the powers afforded to the Committee under Rule 10.2. The Administrator will be entitled to sub-delegate the rights conferred to it under this Rule 10.

10.1.3 The Chairperson of the Committee will appoint a Secretary to keep the minutes of its meetings.

### 10.2. Duties and powers of the Committee

10.2.1 The Committee will have full and exclusive discretionary power and authority to operate and administer the Plan, including without limitation exclusive discretionary power and authority:

(A)     to construe the Plan and the Rules of the Plan;

(B)     to determine questions of eligibility, deferral and forfeiture;

(C)     to determine, in its sole discretion, how any Deferred Compensation is invested by the Trustee and advise the Trustee accordingly;

(D)     to determine entitlement to Distributions;

(E)     to make any determinations and decisions in the exercise of its discretionary power and authority;

(F)     to engage any professional advisers it determines appropriate to assist in the administration of the Plan;

(G)     to delegate any of its discretionary powers or authorities to the Trustee, executive officers or a committee of executive officers of the Company, or any other Person or committee; and

(H)     to establish, operate and administer subplans under the Plan for Participants in particular jurisdictions under which participation may be subject to additional and/or modified terms and conditions, having regard to any securities, employment, exchange control or taxation laws, which may apply to any Participant and any Participating Employer. Any subplans must conform to the basic principles of the Plan and cannot enhance the benefits available under it to any Participant.

10.2.2 Any decision of the Committee will, in the absence of manifest error, be final, binding and non-appealable on all Persons.

### 10.3. Compliance with local law

If the Committee determines any of the Rules are materially inconsistent with any jurisdiction's laws or administrative practices, including applicable regulatory and tax laws, the Committee may, to the

extent necessary or appropriate to comply with applicable laws or administrative practices, including applicable regulatory and tax laws, establish, adopt or revise these Rules and related procedures, as it deems necessary or appropriate.

**10.4. Payment of expenses and indemnification**

10.4.1 The Company will pay all expenses reasonably incurred in the administration of the Plan. However, the Company may require any Participating Employer to enter into an agreement that obliges that Participating Employer to reimburse the Company for any costs borne by the Company, directly or indirectly, in respect of the Participating Employer's Eligible Employees or Participants.

10.4.2 The Participating Employers will indemnify and hold each member of the Committee and the Administrator harmless from all claims, liabilities and costs arising out of the good faith performance of their services with respect to the Plan or its operation or administration unless such claims, costs and other liabilities are attributable to fraud, misconduct or negligence on the part of such Person.

10.4.3 The Participating Employers may obtain and provide for the members of the Committee liability insurance against liabilities imposed on them by law.

**10.5. Record keeping**

10.5.1 The Committee will maintain, or cause to be maintained, suitable records of (i) each Participating Employer and the date on which it adopted the Plan; (ii) each Participant's Deferral Accounts and Deferral Subaccounts; (iii) each Investment Account; and (iv) the Committee's findings, determinations and decisions. For the purpose of maintaining these records, the Committee and any Persons engaged by it under Rule 10.2 will have "read only" access to the transactions and balances in the Investment Accounts, the Deferral Accounts and the Deferral Subaccounts.

10.5.2 The Committee will not be required to maintain any records which duplicate any records maintained by the Participating Employers.

**10.6. Online Access to Deferral Accounts**

All Participants will be granted access to an online platform operated by the Recordkeeper (or any other third party platform provider), which sets out the Assets held in, and the value of, the Participant's Deferral Accounts and each Deferral Subaccount, and any other information that the Committee determines should be provided to the Participants.

**10.7. Inspection of records**

A copy of the Plan and the records of a Participant's Deferral Accounts and Deferral Subaccounts will be open to inspection by the Participant or the Participant's duly authorized representatives at the principal office of the Participant's Employer at any reasonable business hour.

**10.8. Notices**

10.8.1 Any notice to be given under the Plan can be given:

(i) by electronic mail, by personal delivery, by first class post or by any other means which a Participating Employer and its employees use to communicate with each other; and

(ii) in the case of a Business Entity to its registered office or the address of its principal place of business and in the case of an individual to the individual's last known address.

10.8.2 Any notice will be given: (i) if delivered, at the time of delivery; (ii) if posted at 10:00am on the third day after it was put in the post; or (iii) if sent by electronic mail, at the time of despatch. In proving service of notice it will be sufficient to prove that delivery was made or that the envelope containing it was properly addressed, prepaid and posted or that the email or other form of electronic transfer was properly addressed and despatched, as appropriate.

## 11. MISCELLANEOUS

### 11.1. Termination of the Plan

The Company may at any time terminate the Plan with effect for all Participating Employers or for single Participating Employers. If the Plan is terminated, outstanding Awards may be paid at the time and in the manner determined by the Committee.

### 11.2. Rights of Employees

11.2.1 The Plan is a voluntary undertaking on the part of the Participating Employers and will not constitute a contract between a Participating Employer and any Employee with respect to, or consideration for, or an inducement or condition of, the employment of that Employee. Nothing contained in the Plan will give any Employee the right to be retained in the service of his Employer or interfere with or restrict the rights of the Participating Employers, which are hereby expressly reserved, to discharge any Employee at any time without notice and with or without Cause. Participation in the Plan is not pensionable. Nothing in the Plan or in any document executed under it will give any officer or employee of a Participating Employer any right to participate in the Plan. Participation in the Plan in one Plan Year will not guarantee or entitle participation in the Plan in respect of any subsequent Plan Year. The rights and obligations of any individual under the terms of the individual's office or Employment with any member of the Group will not be affected by the individual's participation in the Plan nor any right which the individual may have to participate under it.

11.2.2 A Participant waives all or any rights to compensation or damages under the Plan in consequence of the Participant's termination of office or employment with a member of the Group for any reason. Nothing in the Plan or in any document executed under it will give any Person any right to continue in employment or will affect the right of any member of the Group to terminate the employment of any Person without liability at any time with or without cause, or will impose on any member of the Group or the Committee or their respective agents and employees any liability in connection with the loss of a Participant's benefits or rights under the Plan, the failure or refusal of any person to exercise a discretion under the Plan and or a Participant ceasing to be a person who has the status or relationship of an employee or director of any member of the Group for any reason as a result of the termination of the Participant's Employment.

### 11.3. Unfunded obligations of the Participating Employers

The obligations of the Participating Employers under the Plan will be unfunded and unsecured. Nothing contained in the Plan will be construed as providing for the Assets of any Trust to be segregated from the Assets of the respective Participating Employers for the benefit of any Participant or his heirs. To the extent that a Participant or a Participant's heir has the right to receive Distributions from a Participating Employer, in respect of an Award or a Deferral Account or an

Investment Account, that right will be no greater than the right of an unsecured general creditor of the Participating Employer.

### 11.4. Adoption of Plan by other Employers

Any member of the Group which is not a Participating Employer may, with the consent of the Company, adopt the Plan.

### 11.5. Errors and misstatements

In the event of any clerical error or any misstatement or omission of fact by a Participant which results in the payment of Distributions in an incorrect amount, the Committee will, on discovery of the facts promptly cause the amount of future payments of Distributions to be corrected. Subject to compliance with, and except as may be limited or prohibited at applicable local law, the relevant Participating Employer will, as appropriate, pay the amount of any underpayment to the Participant or his heirs. The relevant Participating Employer (or the Trustee if the overpayment was made by the Trustee) may, as appropriate, recoup any overpayment from future payments of Distributions to the Participant or his heirs in the amounts the Committee directs or proceed against the Participant or his heirs for recovery of any overpayment.

### 11.6. Payment on behalf of certain heirs

If any Distributions would be paid under the Plan to a Participant's heir who is a minor, or a Person who is considered by the Committee for any reason to be unable to give a valid receipt therefor, the Committee may direct that the Distributions are paid to any Person found by the Committee to have care of the minor or other Person. Any payment made pursuant to that direction will constitute a full release and discharge of the Committee and the other Plan fiduciaries.

### 11.7. Amendment of Plan

The Committee reserves the right at any time and from time to time to modify, alter, amend, suspend, discontinue or terminate the Plan in any respect whatsoever, including in any manner that adversely affects the rights of Participants, which right may be exercised by duly authorized delegation.

### 11.8. Consents

The operation of the Plan in any jurisdiction will be subject to obtaining any necessary approval or consent in that jurisdiction.

### 11.9. Third party rights

Nothing in this Plan confers any benefit, right or expectation on a Person who is not a Participant. No third party has any rights to enforce any term of the Plan.

### 11.10. Data protection

All Particpants will agree, as a condition of their participation in the Plan, that any personal data in relation to them may be held by the Company, any Participating Employer and/or the Trustees and passed on to a third party broker, registrar, administrator and/or future purchaser of the Company for all purposes relating to the operation or administration of the Plan, including to countries or territories outside the European Economic Area.

### 11.11. Governing law

FINAL VERSION

The Plan will be construed and administered under, and governed in all respects by the laws of England, without regard to principles of conflict of laws. However, any Subplan adopted may provide that it will be governed by the law of another jurisdiction, without regard to the principles of conflict of laws. All Participants, the Company and all Participating Employers will, to the extent legally possible, submit to the courts of England in relation to anything arising under the Plan.

FINAL VERSION

# APPENDIX 1

## GERMANY

This Appendix specifies the terms and conditions under which the Plan is modified in its application to a Person resident for tax purposes in Germany.

Words and expressions defined in the Plan have the same meaning in this Appendix except as otherwise provided.

1. **Rule 1.1 (Definitions):** The definition of "Cause" in Rule 1.1 will, with regard to sub-clause (ii), read as follows:

   "(ii) violates any laws, rules or regulations applicable to insurance companies, investment companies (including but not limited to *Kapitalanlagegesellschaften*), financial services institutions, banks, investment banks, broker-dealers, investment advisors or the banking and securities industries generally and such violation (A) could subject the Participating Employer or any of its affiliates to any disqualification, sanction, fine, penalty or similar measure of or by any regulatory authority of a competent jurisdiction; or (B) either is or, if known to others outside the Participating Employer, would be Detrimental;".

2. **Rule 11.6 (Payment on behalf of certain heirs):** The words ", unless otherwise required by law," will be inserted in Rule 11.6 after the second occurrence of the word "Committee" in the first sentence.

3. **Rule 11.7 (Amendment of Plan):** The following second sentence will be inserted in Rule 11.7: "Without limiting the rights of the Committee conferred on it under the preceding sentence, the Committee, the Company and/or any Participating Employer may modify, alter, amend or suspend terms and conditions of the Plan in order to reflect or comply with German law, in particular the German regulatory remuneration standards for financial insitutions."

FINAL VERSION

**APPENDIX 2**

**UNITED KINGDOM**

This Appendix specifies the terms and conditions under which the Plan is to be modified in its application to a person resident for tax purposes in the United Kingdom.

Words and expressions defined in the Plan will have the same meaning in this Appendix except as otherwise provided.

1.  The definitions of **Deferral Account** and **Deferral Subaccount** in Rule 1 will be deleted.

2.  Rule 4 (Deferral Accounts), Rule 5 (Investment of Deferred Compensation), Rule 10.6 (Online Access to Deferral Accounts) and Rule 10.7 (Inspection of Records) will not apply.

3.  All Compensation deferred in respect of Participants will be held in an aggregate amount by the Trustee under a separate agreement with the Trustee, with no earmarking of any amounts in respect of Participants until Distribution.

4.  In Rule 8.2 (Good Leaver Termination) and Rule 8.3 (Termination due to death or disability) the words "equal to the value of the Assets in the Participant's Deferral Account" will be deleted and replaced with the words "in respect of the Participant's Award(s)" and the final sentence will be deleted.

5.  Rule 9.1 (Payment of Distributions - Normal Distributions) will be amended to read as follows:

    "On or around the last day of the Deferral Period of an Award, the Participant's Participating Employer will pay or direct the Trustee to pay, to the Participant an amount equal to the value of the Assets held in respect of the Award by the Trustee at the last day of the relevant Deferral Period (or the last practicable business day of the relevant Deferral Period)."

6.  Rule 10.5.1 will be amended to read as follows:

    "The Committee will maintain or cause to be maintained, suitable records of (i) each Participating Employer and the date on which it adopted the Plan; and (ii) the Committee's findings determinations and decisions."

7.  In Rule 10.7 the words "and the records of a Participant's Deferral Accounts and Deferral Subaccounts" will be deleted.

8.  In Rule 11.3 the words "or a Deferral Account or an Investment Account" will be deleted.

## APPENDIX 3

### UNITED STATES

The purpose of this United States Annex is to modify certain provisions to the Allianz Global Investors Deferral Into Funds Plan (the "Plan") or, as necessary, to add additional provisions so as to make the Plan compliant with the provisions of Section 409A of the Internal Revenue Code of 1986, as amended ("Section 409A"). This Appendix only applies to Participants in the Plan who are subject to United States taxation on their earned income. If the provisions in this Appendix conflict with the Rules of the Plan, then the conflicting Rule will be superseded by the provision in this Appendix, but only to the extent of any conflict and only to the extent necessary to comply with Section 409A.  Words and expressions defined in the Plan will have the same meaning in this Appendix except as otherwise provided.

1.  DEFINITIONS AND INTERPRETATION

   1.1. **Definitions**

   The following definitions will apply to the Plan:

   **Separation from Service** means the date on which the Participant separates from service with the Group within the meaning of Section 409A, whether by reason of death, disability, retirement, or otherwise. In determining Separation from Service, with regard to a bona fide leave of absence that is due to any medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of not less than six months, where such impairment causes the Employee to be unable to perform the duties of his or her position of employment or any substantially similar position of employment, a 29-month period of absence will, as permitted, be substituted for the six-month period set out in Section 1.409A-1(h)(1)(i) of the regulations issued under Section 409A.

   **Specified Employee** means an individual who is a "specified employee" under Section 409A and the regulations issued under Section 409A.

7.  VESTING OF DEFERRAL ACCOUNTS; DEFERRAL PERIODS; FORFEITURE

   7.2.  **Deferral Periods**

   7.2.  The following will be added at the end of clause (i) in Rule 7.2. after the phrase "for which Compensation was deferred in respect of the Participant":

   "and, in the case of Participants employed in the United States, as may be further limited by Section 409A"

8.  TERMINATION OF EMPLOYMENT AND FORFEITURE OF AWARDS

   8.2.  **Good leaver termination**

   The following will be added to the end of Rule 8.2:

   "If a Distribution is to be made to a Participant due to a Separation from Service and the Participant is a Specified Employee on the date of Separation from Service, no Distribution may be made to the Specified Employee from the Plan before the date that is six months after the date of Separation from Service or, if earlier, the date of death; provided, however, that this does not apply to Distributions that are excepted pursuant to the last sentence of Section 1.409A-3(i)(2)(i) of the regulations issued under Section 409A."

8.5. **Participating Employer leaving the Group**

The following will be added to the end of Rule 8.5:

"In the case of Participants employed in the United States, if the 90-day period would cover two Plan Years, Distribution of the Participant's Deferral Account will be made on the 90th day of that period, or such later date as required by Section 409A if the Participant is a Specified Employee."

9.    PAYMENT OF DISTRIBUTIONS

9.1. **Normal distributions**

The following will be added to the end of Rule 9.1:

"Notwithstanding the foregoing, in accordance with Section 409A benefits under the Plan may not be distributed earlier than the first of the following events to occur:

(A)     the Participant's Separation from Service;

(B)     the date the Participant becomes disabled;

(C)     the Participant's date of death; or

(D)     the occurrence of an Unforeseen Emergency.

10.    ADMINISTRATION

10.2. **Duties and powers of the Committee**

10.2.1 The following will be added to the end of Rule 10.2.1:

"In no event will the Committee or Administrator use its authority or discretion to accelerate the timing of Distributions under the Plan except to the extent permitted by Section 409A."

10.3. **Compliance with local law**

The following will be added to the end of Rule 10.3:

"It is intended that the Plan be exempt from, or comply with, Section 409A and any regulations, guidance and transitional rules issued under Section 409A, and the Plan will be interpreted and operated consistently with that intent. If any Person with authority to interpret the Plan determines that any provisions of the Plan do not comply with the requirements of Section 409A, that Person will inform the Person having authority to amend the Plan who may amend the Plan, without the prior consent of any Participant, in any respect that Person deems necessary (including retroactively) to ensure compliance with Section 409A; provided, however, that any amendment affecting amounts previously deferred under the Plan will be made in a manner that seeks to preserve the economic value of the deferred amounts to the Participant."

11.    MISCELLANEOUS

11.1. **Termination of the Plan**

11.1.1 The following will be added to the end of Rule 11.1:

"In no event will such termination accelerate the timing of Distributions under the Plan except to the extent permitted by Section 409A."

## 11.7. **Amendment of Plan**

The following will be added to the end of Rule 11.7:

"In no event will any such amendment accelerate the timing of Distributions under the Plan except to the extent permitted by Section 409A."

**Exhibit B**

POS-015

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*:<br>Richard A. Hoyer SBN 151931; Ryan L. Hicks SBN 260284<br>Hoyer & Associates<br>4 Embarcadero Center, Suite 1400<br>San Francisco, CA 94111<br><br>TELEPHONE NO: 415-766-3539    FAX NO. *(Optional)*: 415-276-1738<br>E-MAIL ADDRESS *(Optional)*: rhoyer@hoyerlaw.com; rhicks@hoyerlaw.com<br>ATTORNEY FOR *(Name)*: plaintiff Seung Minn | FOR COURT USE ONLY |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco
STREET ADDRESS: 400 McAllister St.
MAILING ADDRESS: 400 McAllister St.
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME: Civic Center Courthouse

PLAINTIFF/PETITIONER: Seung Minn

DEFENDANT/RESPONDENT: Allianz Asset Management of America L.P. et al.

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER:<br>CGC-14-538538 |
|---|---|

TO *(insert name of party being served)*: all non-DOE Defendants

## NOTICE

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing: April 11, 2014

Ryan L. Hicks
_____                    ►    _____
(TYPE OR PRINT NAME)                                 (SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

## ACKNOWLEDGMENT OF RECEIPT

This acknowledges receipt of *(to be completed by sender before mailing)*:
1. [✓]  A copy of the summons and of the complaint.
2. [✓]  Other *(specify)*:

Alternative Dispute Resolution (ADR) Package

*(To be completed by recipient):*

Date this form is signed: April   , 2014

Bruce R. Millman, Counsel for Defendants
_____                    ►    _____
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,         (SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ON WHOSE BEHALF THIS FORM IS SIGNED)                  ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
POS-015 [Rev. January 1, 2005]

**NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL**

Code of Civil Procedure,
§§ 415.30, 417.10
www.courtinfo.ca.gov

American LegalNet, Inc.
www.USCourtForms.com

**Exhibit C**

CASE NUMBER: CGC-14-538538 SEUNG MINN VS. ALLIANZ ASSET MANAGEMENT OF AM

## NOTICE TO PLAINTIFF

A Case Management Conference is set for:

| | |
|---|---|
| **DATE:** | **SEP-10-2014** |
| **TIME:** | **10:30AM** |
| **PLACE:** | **Department 610** |
| | **400 McAllister Street** |
| | **San Francisco, CA 94102-3680** |

All parties must appear and comply with Local Rule 3.

CRC 3.725 requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference. However, it would facilitate the issuance of a case management order **without an appearance** at the case management conference if the case management statement is filed, served and lodged in Department 610 twenty-five (25) days before the case management conference.

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state. **This case is eligible for electronic filing and service per Local Rule 2.10. For more information, please visit the Court's website at www.sfsuperiorcourt.org under Online Services.**

## ALTERNATIVE DISPUTE RESOLUTION POLICY REQUIREMENTS

**IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE PARTICIPATE IN EITHER MEDIATION, JUDICIAL OR NON-JUDICIAL ARBITRATION, THE EARLY SETTLEMENT PROGRAM OR SOME SUITABLE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A TRIAL.**
**(SEE LOCAL RULE 4)**

Plaintiff must serve a copy of the Alternative Dispute Resolution Information Package on each defendant along with the complaint. All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the Alternative Dispute Resolution Information Package prior to filing the Case Management Statement.

**[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]**

Superior Court Alternative Dispute Resolution Coordinator
400 McAllister Street, Room 103
San Francisco, CA 94102
(415) 551-3876

See Local Rules 3.3, 6.0 C and 10 B re stipulation to judge pro tem.

 

**Superior Court of California, County of San Francisco**
**Alternative Dispute Resolution**
**Program Information Package**

| The plaintiff must serve a copy of the ADR information package on each defendant along with the complaint.  (CRC 3.221(c)) |
| --- |

## WHAT IS ADR?

Alternative Dispute Resolution (ADR) is the term used to describe the various options available for settling a dispute without a trial.  There are many different ADR processes, the most common forms of which are mediation, arbitration and settlement conferences.  In ADR, trained, impartial people decide disputes or help parties decide disputes themselves.  They can help parties resolve disputes without having to go to court.

## WHY CHOOSE ADR?

"It is the policy of the Superior Court that every noncriminal, nonjuvenile case participate either in an early settlement conference, mediation, arbitration, early neutral evaluation or some other alternative dispute resolution process prior to trial." (Local Rule 4)

ADR can have a number of advantages over traditional litigation:

- **ADR can save time.**  A dispute often can be resolved in a matter of months, even weeks, through ADR, while a lawsuit can take years.
- **ADR can save money,** including court costs, attorney fees, and expert fees.
- **ADR encourages participation.**  The parties may have more opportunities to tell their story than in court and may have more control over the outcome of the case.
- **ADR is more satisfying.**  For all the above reasons, many people participating in ADR have reported a high degree of satisfaction.

## HOW DO I PARTICIPATE IN ADR?

Litigants may elect to participate in ADR at any point in a case.  General civil cases may voluntarily enter into the court's ADR programs by any of the following means:

- Filing a Stipulation to ADR: Complete and file the Stipulation form (attached to this packet) at the clerk's office located at 400 McAllister Street, Room 103;
- Indicating your ADR preference on the Case Management Statement (also attached to this packet); or
- Contacting the court's ADR office (see below) or the Bar Association of San Francisco's ADR Services at 415-782-8905 or www.sfbar.org/adr for more information.

**For more information about ADR programs or dispute resolution alternatives, contact:**

Superior Court Alternative Dispute Resolution
400 McAllister Street, Room 103, San Francisco, CA   94102
415-551-3876

*Or, visit the court ADR website at www.sfsuperiorcourt.org*

The San Francisco Superior Court offers different types of ADR processes for general civil matters; each ADR program is described in the subsections below:

## 1) SETTLEMENT CONFERENCES

The goal of settlement conferences is to provide participants an opportunity to reach a mutually acceptable settlement that resolves all or part of a dispute early in the litigation process.

**(A) THE BAR ASSOCIATION OF SAN FRANCISCO (BASF) EARLY SETTLEMENT PROGRAM (ESP):** ESP remains as one of the Court's ADR programs (see Local Rule 4.3) but parties must select the program – the Court no longer will order parties into ESP.

**Operation:** Panels of pre-screened attorneys (one plaintiff, one defense counsel) each with at least 10 years' trial experience provide a minimum of two hours of settlement conference time, including evaluation of strengths and weakness of a case and potential case value. On occasion, a panelist with extensive experience in both plaintiff and defense roles serves as a sole panelist. BASF handles notification to all parties, conflict checks with the panelists, and full case management. The success rate for the program is 78% and the satisfaction rate is 97%. Full procedures are at: www.sfbar.org/esp.

**Cost:** BASF charges an administrative fee of $295 per party with a cap of $590 for parties represented by the same counsel. Waivers are available to those who qualify. For more information, call Marilyn King at 415-782-8905, email adr@sfbar.org or see the enclosed brochure.

**(B) MANDATORY SETTLEMENT CONFERENCES:** Parties may elect to apply to the Presiding Judge's department for a specially-set mandatory settlement conference. See Local Rule 5.0 for further instructions. Upon approval of the Presiding Judge, the court will schedule the conference and assign the case for a settlement conference.

## 2) MEDIATION

Mediation is a voluntary, flexible, and confidential process in which a neutral third party facilitates negotiations. The goal of mediation is to reach a mutually satisfactory agreement, before incurring the expense of going to court, that resolves all or part of a dispute after exploring the interests, needs, and priorities of the parties in light of relevant evidence and the law. A mediator strives to bring the parties to a mutually beneficial settlement of the dispute.

**(A) MEDIATION SERVICES OF THE BAR ASSOCIATION OF SAN FRANCISCO,** in cooperation with the Superior Court, is designed to help civil litigants resolve disputes before they incur substantial costs in litigation. While it is best to utilize the program at the outset of litigation, parties may use the program at any time while a case is pending.

**Operation:** Experienced professional mediators, screened and approved, provide one hour of preparation time and the first two hours of mediation time. Mediation time beyond that is charged at the mediator's hourly rate. BASF pre-screens all mediators based upon strict educational and experience requirements. Parties can select their mediator from the panels at www.sfbar.org/mediation or BASF can assist with mediator selection. The BASF website contains photographs, biographies, and videos of the mediators as well as testimonials to assist with the selection process. BASF staff handles conflict checks and full case management.

Mediators work with parties to arrive at a mutually agreeable solution. The success rate for the program is 64% and the satisfaction rate is 99%.

**Cost:** BASF charges an administrative fee of $295 per party. The hourly mediator fee beyond the first three hours will vary depending on the mediator selected. Waivers of the administrative fee are available to those who qualify. For more information, call Marilyn King at 415-782-8905, email adr@sfbar.org or see the enclosed brochure.

**(B) PRIVATE MEDIATION:** Although not currently a part of the court's ADR program, civil disputes may also be resolved through private mediation. Parties may elect any private mediator or mediation organization of their choice; the selection and coordination of private mediation is the responsibility of the parties. Parties may find mediators and organizations on the Internet. The cost of private mediation will vary depending on the mediator selected.

## 3) ARBITRATION

An arbitrator is neutral attorney who presides at a hearing where the parties present evidence through exhibits and testimony. The arbitrator applies the law to the facts of the case and makes an award based upon the merits of the case.

**(A) JUDICIAL ARBITRATION:** When the court orders a case to arbitration it is called "judicial arbitration". The goal of arbitration is to provide parties with an adjudication that is earlier, faster, less formal, and usually less expensive than a trial.

**Operation:** Pursuant to CCP 1141.11 and Local Rule 4, all civil actions in which the amount in controversy is $50,000 or less, and no party seeks equitable relief, shall be ordered to arbitration. (Upon stipulation of all parties, other civil matters may be submitted to judicial arbitration.) A case is ordered to arbitration after the Case Management Conference. An arbitrator is chosen from the court's arbitration panel. Arbitrations are generally held between 7 and 9 months after a complaint has been filed. Judicial arbitration is not binding unless all parties agree to be bound by the arbitrator's decision. Any party may request a trial within 60 days after the arbitrator's award has been filed.

Local Rule 4.2 allows for mediation in lieu of judicial arbitration, so long as the parties file a stipulation to mediate after the filing of a complaint. If settlement is not reached through mediation, a case proceeds to trial as scheduled.

**Cost:** There is no cost to the parties for judicial arbitration.

**(B) PRIVATE ARBITRATION:** Although not currently a part of the court's ADR program, civil disputes may also be resolved through private arbitration. Here, the parties voluntarily consent to arbitration. If all parties agree, private arbitration may be binding and the parties give up the right to judicial review of the arbitrator's decision. In private arbitration, the parties select a private arbitrator and are responsible for paying the arbitrator's fees.

TO PARTICIPATE IN ANY OF THE COURT'S ADR PROGRAMS, PLEASE COMPLETE THE ATTACHED STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION AND SUBMIT IT TO THE COURT. YOU MUST ALSO CONTACT BASF TO ENROLL IN THE LISTED BASF PROGRAMS. THE COURT DOES NOT FORWARD COPIES OF COMPLETED STIPULATIONS TO BASF.

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name and address)* | FOR COURT USE ONLY |
|---|---|
| TELEPHONE NO.:<br><br>ATTORNEY FOR *(Name):*<br><br>SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO<br>400 McAllister Street<br>San Francisco, CA 94102-4514<br><br>PLAINTIFF/PETITIONER:<br><br>DEFENDANT/RESPONDENT: | |

| STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION (ADR) | CASE NUMBER:<br><br>DEPARTMENT 610 |
|---|---|

**1)** **The parties hereby stipulate that this action shall be submitted to the following ADR process:**

☐ **Early Settlement Program of the Bar Association of San Francisco (BASF) -** Pre-screened experienced attorneys provide a minimum of 2 hours of settlement conference time for a BASF administrative fee of $250 per party. Waivers are available to those who qualify. BASF handles notification to all parties, conflict checks with the panelists, and full case management. www.sfbar.org/esp

☐ **Mediation Services of BASF -** Experienced professional mediators, screened and approved, provide one hour of preparation and the first two hours of mediation time for a BASF administrative fee of $250 per party. Mediation time beyond that is charged at the mediator's hourly rate. Waivers of the administrative fee are available to those who qualify. BASF assists parties with mediator selection, conflicts checks and full case management. www.sfbar.org/mediation

☐ **Private Mediation -** Mediators and ADR provider organizations charge by the hour or by the day, current market rates. ADR organizations may also charge an administrative fee. Parties may find experienced mediators and organizations on the Internet.

☐ **Judicial Arbitration -** Non-binding arbitration is available to cases in which the amount in controversy is $50,000 or less and no equitable relief is sought. The court appoints a pre-screened arbitrator who will issue an award. There is no fee for this program. www.sfsuperiorcourt.org

☐ **Other ADR process (describe)** _____

**2)** **The parties agree that the ADR Process shall be completed by (date):** _____

**3)** **Plaintiff(s) and Defendant(s) further agree as follows:**

_____

_____

_____

| | |
|---|---|
| _____<br>Name of Party Stipulating | _____<br>Name of Party Stipulating |
| _____<br>Name of Party or Attorney Executing Stipulation | _____<br>Name of Party or Attorney Executing Stipulation |
| _____<br>Signature of Party or Attorney | _____<br>Signature of Party or Attorney |
| ☐ Plaintiff ☐ Defendant ☐ Cross-defendant | ☐ Plaintiff ☐ Defendant ☐ Cross-defendant |
| Dated: _____ | Dated: _____ |

☐ *Additional signature(s) attached*

ADR-2  07/12                    STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION

CM-110

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):

FOR COURT USE ONLY

TELEPHONE NO.:          FAX NO. (Optional):

E-MAIL ADDRESS (Optional):

ATTORNEY FOR (Name):

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF**

STREET ADDRESS:

MAILING ADDRESS:

CITY AND ZIP CODE:

BRANCH NAME:

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| **CASE MANAGEMENT STATEMENT** | CASE NUMBER: |
|---|---|

**(Check one):** ☐ **UNLIMITED CASE**    ☐ **LIMITED CASE**
(Amount demanded        (Amount demanded is $25,000
exceeds $25,000)        or less)

A **CASE MANAGEMENT CONFERENCE** is scheduled as follows:

Date:        Time:        Dept.:        Div.:        Room:

Address of court (if different from the address above):

☐ Notice of Intent to Appear by Telephone, by (name):

**INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.**

1. **Party or parties** (answer one):
   a. ☐ This statement is submitted by party (name):
   b. ☐ This statement is submitted **jointly** by parties (names):

2. **Complaint and cross-complaint** (to be answered by plaintiffs and cross-complainants only)
   a. The complaint was filed on (date):
   b. ☐ The cross-complaint, if any, was filed on (date):

3. **Service** (to be answered by plaintiffs and cross-complainants only)
   a. ☐ All parties named in the complaint and cross-complaint have been served, have appeared, or have been dismissed.
   b. ☐ The following parties named in the complaint or cross-complaint
      (1) ☐ have not been served (specify names and explain why not):

      (2) ☐ have been served but have not appeared and have not been dismissed (specify names):

      (3) ☐ have had a default entered against them (specify names):

   c. ☐ The following additional parties may be added (specify names, nature of involvement in case, and date by which they may be served):

4. **Description of case**
   a. Type of case in ☐ complaint ☐ cross-complaint      (Describe, including causes of action):

Form Adopted for Mandatory Use
Judicial Council of California
CM-110 [Rev. July 1, 2011]

**CASE MANAGEMENT STATEMENT**

Page 1 of 5
Cal. Rules of Court,
rules 3.720–3.730
www.courts.ca.gov

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

4.  b.  Provide a brief statement of the case, including any damages. *(If personal injury damages are sought, specify the injury and damages claimed, including medical expenses to date [indicate source and amount], estimated future medical expenses, lost earnings to date, and estimated future lost earnings. If equitable relief is sought, describe the nature of the relief.)*

☐ *(If more space is needed, check this box and attach a page designated as Attachment 4b.)*

5.  **Jury or nonjury trial**
The party or parties request ☐ a jury trial ☐ a nonjury trial. *(If more than one party, provide the name of each party requesting a jury trial):*

6.  **Trial date**
a.  ☐ The trial has been set for *(date):*
b.  ☐ No trial date has been set. This case will be ready for trial within 12 months of the date of the filing of the complaint *(if not, explain):*

c.  Dates on which parties or attorneys will not be available for trial *(specify dates and explain reasons for unavailability):*

7.  **Estimated length of trial**
The party or parties estimate that the trial will take *(check one):*
a.  ☐ days *(specify number):*
b.  ☐ hours (short causes) *(specify):*

8.  **Trial representation** *(to be answered for each party)*
The party or parties will be represented at trial ☐ by the attorney or party listed in the caption ☐ by the following:
a.  Attorney:
b.  Firm:
c.  Address:
d.  Telephone number:       f.  Fax number:
e.  E-mail address:       g.  Party represented:
☐ Additional representation is described in Attachment 8.

9.  **Preference**
☐ This case is entitled to preference *(specify code section):*

10. **Alternative dispute resolution (ADR)**

a.  **ADR information package.** Please note that different ADR processes are available in different courts and communities; read the ADR information package provided by the court under rule 3.221 for information about the processes available through the court and community programs in this case.

(1) For parties represented by counsel: Counsel ☐ has ☐ has not provided the ADR information package identified in rule 3.221 to the client and reviewed ADR options with the client.

(2) For self-represented parties: Party ☐ has ☐ has not reviewed the ADR information package identified in rule 3.221.

b.  **Referral to judicial arbitration or civil action mediation** (if available).

(1) ☐ This matter is subject to mandatory judicial arbitration under Code of Civil Procedure section 1141.11 or to civil action mediation under Code of Civil Procedure section 1775.3 because the amount in controversy does not exceed the statutory limit.

(2) ☐ Plaintiff elects to refer this case to judicial arbitration and agrees to limit recovery to the amount specified in Code of Civil Procedure section 1141.11.

(3) ☐ This case is exempt from judicial arbitration under rule 3.811 of the California Rules of Court or from civil action mediation under Code of Civil Procedure section 1775 et seq. *(specify exemption):*

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
| DEFENDANT/RESPONDENT: | |

10. c. Indicate the ADR process or processes that the party or parties are willing to participate in, have agreed to participate in, or have already participated in *(check all that apply and provide the specified information)*:

| | The party or parties completing this form **are willing** to participate in the following ADR processes *(check all that apply)*: | If the party or parties completing this form in the case **have agreed** to participate in or have already completed an ADR process or processes, indicate the status of the processes *(attach a copy of the parties' ADR stipulation)*: |
|---|---|---|
| (1) Mediation | ☐ | ☐ Mediation session not yet scheduled<br>☐ Mediation session scheduled for *(date)*:<br>☐ Agreed to complete mediation by *(date)*:<br>☐ Mediation completed on *(date)*: |
| (2) Settlement conference | ☐ | ☐ Settlement conference not yet scheduled<br>☐ Settlement conference scheduled for *(date)*:<br>☐ Agreed to complete settlement conference by *(date)*:<br>☐ Settlement conference completed on *(date)*: |
| (3) Neutral evaluation | ☐ | ☐ Neutral evaluation not yet scheduled<br>☐ Neutral evaluation scheduled for *(date)*:<br>☐ Agreed to complete neutral evaluation by *(date)*:<br>☐ Neutral evaluation completed on *(date)*: |
| (4) Nonbinding judicial arbitration | ☐ | ☐ Judicial arbitration not yet scheduled<br>☐ Judicial arbitration scheduled for *(date)*:<br>☐ Agreed to complete judicial arbitration by *(date)*:<br>☐ Judicial arbitration completed on *(date)*: |
| (5) Binding private arbitration | ☐ | ☐ Private arbitration not yet scheduled<br>☐ Private arbitration scheduled for *(date)*:<br>☐ Agreed to complete private arbitration by *(date)*:<br>☐ Private arbitration completed on *(date)*: |
| (6) Other *(specify)*: | ☐ | ☐ ADR session not yet scheduled<br>☐ ADR session scheduled for *(date)*:<br>☐ Agreed to complete ADR session by *(date)*:<br>☐ ADR completed on *(date)*: |

CM-110 [Rev. July 1, 2011]

**CASE MANAGEMENT STATEMENT**

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

**11. Insurance**

a. ☐ Insurance carrier, if any, for party filing this statement *(name):*

b. Reservation of rights: ☐ Yes ☐ No

c. ☐ Coverage issues will significantly affect resolution of this case *(explain):*

**12. Jurisdiction**

Indicate any matters that may affect the court's jurisdiction or processing of this case and describe the status.

☐ Bankruptcy ☐ Other *(specify):*

Status:

**13. Related cases, consolidation, and coordination**

a. ☐ There are companion, underlying, or related cases.

(1) Name of case:
(2) Name of court:
(3) Case number:
(4) Status:

☐ Additional cases are described in Attachment 13a.

b. ☐ A motion to ☐ consolidate ☐ coordinate will be filed by *(name party):*

**14. Bifurcation**

☐ The party or parties intend to file a motion for an order bifurcating, severing, or coordinating the following issues or causes of action *(specify moving party, type of motion, and reasons):*

**15. Other motions**

☐ The party or parties expect to file the following motions before trial *(specify moving party, type of motion, and issues):*

**16. Discovery**

a. ☐ The party or parties have completed all discovery.

b. ☐ The following discovery will be completed by the date specified *(describe all anticipated discovery):*

| Party | Description | Date |
|---|---|---|

c. ☐ The following discovery issues, including issues regarding the discovery of electronically stored information, are anticipated *(specify):*

**CASE MANAGEMENT STATEMENT**

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

**17. Economic litigation**

a. ☐ This is a limited civil case (i.e., the amount demanded is $25,000 or less) and the economic litigation procedures in Code of Civil Procedure sections 90-98 will apply to this case.

b. ☐ This is a limited civil case and a motion to withdraw the case from the economic litigation procedures or for additional discovery will be filed *(if checked, explain specifically why economic litigation procedures relating to discovery or trial should not apply to this case):*

**18. Other issues**

☐ The party or parties request that the following additional matters be considered or determined at the case management conference *(specify):*

**19. Meet and confer**

a. ☐ The party or parties have met and conferred with all parties on all subjects required by rule 3.724 of the California Rules of Court *(if not, explain):*

b. After meeting and conferring as required by rule 3.724 of the California Rules of Court, the parties agree on the following *(specify):*

**20. Total number of pages attached** *(if any):* _____

I am completely familiar with this case and will be fully prepared to discuss the status of discovery and alternative dispute resolution, as well as other issues raised by this statement, and will possess the authority to enter into stipulations on these issues at the time of the case management conference, including the written authority of the party where required.

Date:

_____  ▶ _____
(TYPE OR PRINT NAME)                    (SIGNATURE OF PARTY OR ATTORNEY)

_____  ▶ _____
(TYPE OR PRINT NAME)                    (SIGNATURE OF PARTY OR ATTORNEY)

☐ Additional signatures are attached.

*Early*
*Settlement*
*Program*

Consider The Bar Association
of San Francisco's

*FAST*

Do you have a case filed in San
Francisco Superior Court and want
to settle sooner than your trial date?

*ECONOMICAL*

Want settlement at a lower cost with less
stress and a sooner trial date?

*FAIR*

Want the skills of experienced
panelists in arriving at a realistic
satisfying settlement?

Learn more about the Early Settlement Program–scan
the QRCode or visit www.sfbar.org/adr/esp

## The Early Settlement Program:

◇ Helps you resolve cases quickly and economically

◇ Has been a trusted program for over 20 years

◇ Boasts a 78% settlement rate and 97% satisfaction rate

## Early Settlement provides:

◇ Panels of experienced and impartial attorneys (all with at least 10 years of experience)

◇ Three free hours of settlement conference time per case, including one hour of preparation time

◇ Panelists who are matched with the case's type of law

◇ Low administrative fee of $295/party, capped at $1,500 for parties represented by the same counsel

## What is ESP?

The Bar Association of San Francisco's **Early Settlement Program** (ESP) is available as one of San Francisco Superior Court's Alternative Dispute Resolution (ADR) programs (Local Rule 4.3).

ESP is a **highly successful** ADR program that handles cases in areas of law such as business, personal injury, employment, labor, civil rights, discrimination, insurance, malpractice, landlord/tenant, and many others.

ESP is **unique** in that the panelists, in helping you move toward settlement, can provide you confidential feedback about their evaluation of your case, including opinions as to potential case value.

For more information as well as the complete Policies & Procedures, go to: **www.sfbar.org/esp**

## Who are the Panelists?

They are experienced attorneys with at least 10 years of trial experience. Panels consist of one plaintiff and one defense attorney. Sometimes an attorney who is experienced in both types of representation serves as a solo panelist.

## Costs

There is a $295 administrative fee per party, with a cap of $590 for multiple parties represented by the same attorney, to get the cost of running the program. If you have a fee waiver with the Superior Court, your fee will be waived by the ESP program.

## Contact

》 email: esp@sfbar.org

》 phone: 415-982-1600

》 fax: 415-989-0381

## Steps:

The forms you need can be found at **www.sfbar.org/esp**, or email adr@sfbar.org or call 415-782-8905 for a packet to be sent to you.

❶ Please complete the ESP Agreement and return it to BASF via email at adr@sfbar.org or by fax to 415-989-0381. You don't have to get the other parties to sign, just send yours.

❷ When all parties have signed the ESP Agreement, you will be sent the Notice of ESP, along with an invoice.

❸ There is a $295 administrative fee per party, with a cap of $590 for multiple parties represented by the same attorney. You can pay by check, money order or credit card.

❹ Send your administrative fee by fax, email or mail to: BASF / ESP, 301 Battery Street, Third Floor, San Francisco, California 94111.

❺ When BASF receives the fees from all parties, your matter will be assigned to a panelist (or panel of 2), who you will work with to set the date, time and location for your conference.

❻ If you must reschedule your ESP conference date, work with the other side and your panelist(s) to set the new date. BASF does not need to be notified.

❼ Before your conference, provide a copy of your description of the dispute to all parties and panelists. BASF does not need a copy.

❽ If the matter is settled in your ESP conference, congratulations!

❾ If the matter is not settled in your ESP conference, your initial court date remains the same.

# Exhibit D

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Richard A. Hoyer SBN 151931; Ryan L. Hicks SBN 260284<br>Hoyer & Associates<br>4 Embarcadero Center, Suite 1400<br>San Francisco, CA 94111<br><br>TELEPHONE NO.: 415-766-3539     FAX NO. *(Optional):* 415-276-1738<br>E-MAIL ADDRESS *(Optional):* rhoyer@hoyerlaw.com; rhicks@hoyerlaw.com<br>ATTORNEY FOR *(Name):* plaintiff Seung Minn | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco
STREET ADDRESS: 400 McAllister St.
MAILING ADDRESS: 400 McAllister St.
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME: Civic Center Courthouse

PLAINTIFF/PETITIONER: Seung Minn

DEFENDANT/RESPONDENT: Allianz Asset Management of America L.P. et al.

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER:<br>CGC-14-538538 |
|---|---|

TO *(insert name of party being served):* <u>all non-DOE Defendants</u>

### NOTICE

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing: April 11, 2014

Ryan L. Hicks
_____          ▶
(TYPE OR PRINT NAME)                              (SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

### ACKNOWLEDGMENT OF RECEIPT

This acknowledges receipt of *(to be completed by sender before mailing):*
1. [✓] A copy of the summons and of the complaint.
2. [✓] Other *(specify):*
   Alternative Dispute Resolution (ADR) Package

*(To be completed by recipient):*

Date this form is signed: April 30, 2014

*LITTLER MENDELSON, P.C.*
By Bruce R. Millman, Counsel for Defendants            ▶ *Bruce R Millman*  Counsel
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,          (SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ON WHOSE BEHALF THIS FORM IS SIGNED)                    ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Form Adopted for Mandatory Use<br>Judicial Council of California<br>POS-015 [Rev. January 1, 2005]      **NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL**      Code of Civil Procedure,<br>§§ 415.30, 417.10<br>www.courtinfo.ca.gov<br><br>American LegalNet, Inc.<br>www.USCourtForms.com