1  HOYER & ASSOCIATES
   Richard A. Hoyer (SBN 151931)
2  rhoyer@hoyerlaw.com
   Ryan L. Hicks (SBN 260284)
3  rhicks@hoyerlaw.com
   4 Embarcadero Center, Suite 1400
4  San Francisco, CA  94111
   *tel* (415) 766-3539
5  *fax* (415) 276-1738

6  Attorneys for Plaintiff
   SEUNG MINN
7

8            IN THE UNITED STATES DISTRICT COURT

9       NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

10
   SEUNG MINN,                        Case No. 4:14-cv-02220-PJH
11
                Plaintiff,            **OPPOSITION TO DEFENDANTS'**
12                                    **MOTION TO DISMISS, OR IN THE**
            vs.                       **ALTERNATIVE, TO COMPEL**
13                                    **ARBITRATION AND FOR A STAY**
   ALLIANZ ASSET MANAGEMENT OF
14 AMERICA L.P., *et al.*,            Date: July 9, 2014
                                      Time: 9:00 a.m.
15              Defendants,           Courtroom: 3

16                                    Action Filed: April 9, 2014
                                      Removal Date: May 14, 2014
17                                    Trial Date Not Set

18

19

20

21

22

23

24

# **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................... 1

I.      STATEMENT OF FACTS........................................................................... 1

II.     THE LTIPA AND DIF ARE BONUS PLANS, NOT EMPLOYEE BENEFIT PLANS

COVERED BY ERISA............................................................................... 5

     A.     ERISA Covers Only Plans That Systematically Defer Compensation Until
          Termination or Retirement............................................................... 5

     B.     Federal Courts, Including This Court, Have Uniformly Rejected Application
          of ERISA to Similar Bonus Plans .................................................... 8

     C.     The Cases Cited by Defendants' Are Either Inapposite or Actually Support
          Plaintiff's Arguments..................................................................... 11

     D.     Minn Did Not Fail to Exhaust Administrative Remedies, Because No
          Claims Procedures Actually Existed .............................................. 12

     E.     Since The LTIPA and DIF Are Bonus Plans Not Subject to ERISA, They
          Cannot Be "Top Hat" Plans .......................................................... 13

     F.     Neither the LTIPA nor the DIF are Top Hat Plans ......................... 13

III.    THE  ARBITRATION  PROVISION  EMBEDDED  IN  THE  LTIPA  IS

UNCONSCIONABLE AND UNENFORCEABLE UNDER CALIFORNIA LAW ......... 15

     A.     The  Arbitration  Agreement  is  Unquestionably  Unconscionable
          Procedurally ................................................................................ 16

     B.     The Arbitration Provision is Substantively Unconscionable........................... 17

          1. The Provision Purports to Require Employer-Controlled Pre-Arbitration
          Dispute Resolution ...................................................................... 18

          2. The Arbitration Provision Requires Minn to Pay Substantial Costs Unique to
          Arbitration.................................................................................... 18

          3. The Provision Lacks Mutuality................................................... 20

4. The Provision Illegally Attempts to Waive Unwaivable Statutory Rights Under the California Labor Code ................................................................ 21

5. The Undisclosed but Incorporated AAA Commercial Rules Permit The Arbitrator to Deny Adequate Discovery ........................................................ 21

6. The Concealed Choice-of-law Provision is Unenforceable........................ 23

C.    The Offending Terms Cannot Be Severed or Limited ................................... 23

CONCLUSION................................................................................................................ 25

**TABLE OF AUTHORITIES**

**Federal Cases**

*AT&T Mobility v. Concepcion,* 131 S.Ct. 1740 (2011)......................................................... 20

*Callan v. Merrill Lynch & Co., Inc.,* 2010 WL 3452372 at *10 (S.D.Cal. Aug. 30, 2010) 14, 15

*Eastman Kodak Co. v. STWB, Inc.,* 452 F.3d 215 (2d Cir. 2006) ....................................... 13

*Emmenegger v. Bull Moose Tube Co.,* 197 F.3d 929 (8th Cir. 1999) ............................. 9, 13

*Ferguson v. Countrywide Credit Industries, Inc.,* 298 F.3d 778 (9th Cir. 2002) ................... 24

*Guiragoss v. Khoury,* 444 F.Supp.2d 649 (E.D.Va. 2006) ................................................. 15

*Hagel v. United Land Company,* 759 F.Supp. 1199 (E.D.Va. 1991) .................................. 10

*Hahn v. National Bank, N.A.,* 99 F.Supp.2d 275 (E.D.N.Y. 2000) ..................................... 10

*Hampers v. W.R. Grace & Co.,* 202 F.3d 44 (1st Cir. 2000) .............................................. 13

*Houston v. Saracen Energy Advisors,* 2009 WL 890384 (S.D.Tex. March 27, 2009) ......... 10

*In Re Segovia,* 404 B.R. 896 (N.D.Cal.2009, Phyllis J. Hamilton, presiding).......... 6, 8, 9, 10

*Ingle v. Circuit City Stores, Inc.,* 328 F.3d 1165 (9 Cir. 2003) ...................................... 20, 21

*Kirkendall v. Halliburton, Inc.* 707 F.3d 173 (2d. Cir. 2013) .......................................... 12, 13

*Lafian v. Electronic Data Systems Corp.,* 856 F.Supp. 339 (E.D.Mich. 1994) ............... 8, 10

*McKinsey v. Sentry Ins.,* 986 F.2d 401 (10th Cir. 1993) .................................................... 11

*Modzelewski v. RTC,* 14 F.3d 1374 (9th Cir. 1994) ........................................................... 11

Murphy v. DirecTV, Inc., 724 F 3d 1218 (9th Cir. 2013) .................................................... 17

*Murphy v. Inexco Oil Co.,* 611 F.2d 570 (5th Cir. 1980)................................................passim

*Paese v. Hartford Life & Accident Ins. Co.,* 449 F.3d 435 (2d. Cir. 2006)..................... 12, 13

*Pokorny v. Quixtar, Inc.,* 601 F.3d 987 (9th Cir. 2010)................................................. 18, 24

*Spitz v. Berlin Indus. Inc.,* 1994 WL 48593, (N.D.Ill., Feb. 16, 1994) ................................ 11

*Vaught v. Scottsdale Healthcare Corp. Health Plan,* 546 F.3d 620 (9th Cir. 2008) ............ 13

**State Cases**

*Abramson v. Juniper Networks, Inc.,* 115 Cal. App. 4th 638 (2004) ..................................... 24

*Armendariz v. Foundation Health Psychcare Services, Inc.*, 24 Cal.4th 83 (2000)...... passim

*Fitz v. NCR Corp.*, 118 Cal.App.4th 702 (2004)................................................. 16, 17, 22, 24

*Harper v. Ultimo,* 113 Cal.App.4th 1402 (2003) .................................................... 17

*Kinney v. United Healthcare Services, Inc.*, 70 Cal.App.4th 1329 (1999) ..................... 15, 22

*Martinez v. Master Protection Corp.*, 118 Cal. App. 4th 107 (2004) .................................... 22

*McCoy v. Superior Court,* 87 Cal.App.4th 354 (2001)..................................................... 15, 16

*Nyulassi v. Lockheed Martin Corp.*, 120 Cal.App.4th 1267 (2004) ...................................... 18

*O'Hare v. Municipal Resource Consultants*, 107 Cal.App.4th 267 (2003) ......................... 19

*Samaniego v. Empire Today,* 205 Cal.App.4th 1138 (2012)................................................. 23

*Sonic-Calabasas-A Inc. v. Moreno,* 57 Cal.4th 1109 (2013).................................... 15, 19, 21

*Stirlen v. Super Cuts, Inc.,* 51 Cal.App.4th 1519 (1997) ...................................... 16

*Trivedi v. Curexo Technology Corp.,* 189 Cal.App.4th 387 (2010) ....................................... 17

**Federal Statutes**

12 U.S.C. § 1821(e)(3) ............................................................................. 11

29 U.S.C. § 1002(1) ................................................................................... 6

29 U.S.C. § 1002(2) ................................................................................... 8

29 U.S.C. § 1002(2)(A) .............................................................................. 6

29 U.S.C. § 1002(3) ................................................................................... 5

29 U.S.C. §§ 1001 *et seq.* ......................................................................... 4

Fed. R. Civ. P. 15(a) ............................................................................... 25

1  **Regulations**

2  29 C.F.R. § 2510.3-2 ................................................................................ 6

3  29 C.F.R. § 2560.503–1(l) ....................................................................... 13

## INTRODUCTION

Plaintiff SEUNG MINN ("Plaintiff" or "Minn") opposes the Motion to Dismiss, or in the Alternative, to Compel Arbitration and for a Stay ("MTD") of Defendants ALLIANZ ASSET MANAGEMENT OF AMERICA L.P., ALLIANZ ASSET MANAGEMENT OF AMERICA LLC, and ALLIANZ GLOBAL INVESTORS U.S. LLC (collectively "Defendants" or "Allianz") on the grounds that this Court has no jurisdiction over the case because the bonus plans at issue in this case are not subject to ERISA (*See* Plaintiff's Motion for Remand, filed concurrently herewith, also set for hearing on July 9, 2014 at 9:00 a.m.). This Court has no jurisdiction to rule on the instant motion because the case was improperly removed. Plaintiff further opposes the Motion on the grounds that at the time he filed this action there existed no administrative remedies for him to exhaust under either bonus plan, despite his repeated requests for any information regarding any such remedies. Finally, Defendants' alternative Motion to Compel Arbitration must be denied because they never notified Plaintiff of the unconscionable and unenforceable arbitration provision or its governing rules until after it terminated him.

## I.     STATEMENT OF FACTS

Minn sues for damages arising out of Defendants' failure to pay him annual bonuses that it had awarded him during the three years prior to his termination but deferred through two similar bonus plans. (*See* Complaint, Exhibit A to Doc. # 1, Defendants' Notice of Removal ("Complaint")). Defendants and their predecessors required Minn to divert a substantial amount of his annual discretionary bonus each year into two mandatory bonus plans, Defendants' "Long Term *Cash Bonus Plan*" ("LTIPA," Exhibit 1 to the Complaint, emphasis added) and their "Deferral Into Funds Plan (Mandatory)" ("DIF," Exhibit 2 to the Complaint). Under both bonus plans, Minn was entitled to regular annual payouts after a

1  three-year deferral period so long as he was not terminated for "Cause," as defined in a

2  substantially identical fashion in each of the plans. (Complaint at ¶¶1-3).

3      Defendants first enrolled Minn in the LTIPA approximately nine years ago, when he

4  held a Director position. (Declaration of Seung Minn Opposing Motion to Dismiss/Compel

5  Arbitration ("Minn Dec."), filed concurrently herewith, at ¶1; Complaint at ¶¶13, 15.) All of

6  Defendants' employees who held positions at the Vice President-level or above were

7  compelled to participate in the LTIPA. (Minn Dec. at ¶2.) Each year, Minn was awarded a

8  discretionary bonus on top of his regular compensation, a portion of which was then

9  deferred into the LTIPA. Minn subsequently received a deferred LTIPA payout on that

10  diverted bonus three years later. (*Id.* at ¶2, Complaint at ¶15.) Minn was not provided with a

11  copy of the terms and conditions of the LTIPA while in Defendants' employ, he could not

12  opt out of the plan, and he could and did not negotiate or influence the terms, design, or

13  operation of the plan. (*Id.*; Minn Dec. at ¶3.) The LTIPA's stated purpose is "to provide *long-*

14  *term incentives and rewards* to certain key staff and executives of Allianz Global Investors

15  AG, Munich (the "*Group*") and its subsidiaries and certain affiliates in order to promote the

16  Allianz Global Investors Group's long-term growth and profitability." (LTIPA at §1, emphasis

17  added.) The LTIPA's deferral periods are overlapping three-year periods, meaning that

18  after the initial three-year period has elapsed, a participant will receive an LTIPA payment

19  each year as each rolling three-year period ends, so long as they remain employed by

20  Defendants, as Minn did for at least the last six years. (*Id.* at §4; Complaint at ¶15.) The

21  LTIPA refers to some "claims procedures" but does not explain those procedures in any

22  detail.

23      In late 2012, Defendants enrolled Minn in the DIF for the bonus year 2012 and

24  beyond, and informed him that half of the portion of his annual bonus that had up to that

1   point been deposited into the LTIPA would instead be diverted into the DIF each year

2   thereafter. *Id.* at ¶16. As with the LTIPA, Defendants did not disclose to Minn the terms and

3   conditions of the DIF, and he could not opt out of, negotiate terms of, or otherwise influence

4   the design or operation of the DIF.[1] (*Id.;* Minn Dec. at ¶4.) The DIF's deferral periods are

5   also only three years, after which employees receive the payments derived from their initial

6   bonus award as long as they continue to work for Defendants. (*See* Exhibit 2 to the

7   Declaration of Ryan L. Hicks Opposing Motion to Dismiss ("Hicks Dec."), defining DIF

8   three-year deferral period.)

9          During October 2013, Defendants terminated Minn, claiming that the termination was

10  for "Cause" under both bonus plans and declaring forfeit Minn's bonuses that had been

11  diverted into the LTIPA and the DIF but not yet paid out. (Complaint at ¶22.) However,

12  Defendants' asserted grounds for terminating Minn did not constitute "Cause" as defined

13  almost identically in the LTIPA and DIF, respectively. *Id.* at ¶¶32, 37.

14         Shortly after Defendants' terminated Minn, he requested a copy of the LTIPA in

15  order to learn the definition of "Cause" therein, since Defendants had never provided the

16  plan itself to him at any time during his employment, including at his termination. (Minn Dec.

17  at ¶7.).On October 22, 2013, Defendants first provided to Minn a copy of the actual LTIPA

18  (*Id.* at ¶7; Complaint at ¶24), which contains the arbitration provision that Defendants now

19  seek to enforce. (*See* LTIPA, at § 9(f).) That section of the LTIPA states:

20         Any dispute, controversy or claim between the relevant Participating Employer
           and any Participant arising out of or relating to or concerning the provisions of the

21         Plan shall be finally settled by the Arbitration Association of America (the "AAA")
           in accordance with the commercial rules of the AAA. Prior to arbitration, all

22         disputes, controversies, or claims maintained by any Participant must first be
           submitted to the Plan Administrator in accordance with claim procedures

23

---

24  [1] Defendants for the first time provided Minn with a copy of the DIF plan itself during pre-litigation negotiations, months after his termination. (Complaint at ¶26; Hicks Dec. at ¶__).

determined by the Board in its sole discretion.

*Id.* The LTIPA does not include a copy of the AAA's Commercial Rules or indicate how they can be obtained, nor does it further describe the "claim procedures" to which it refers. Prior to receiving a copy of the LTIPA, Minn had never been informed that the LTIPA contained an arbitration provision or any "claims procedures," and obviously never agreed to them. (Minn Dec. at ¶8.) To the contrary, in 2012, when Defendants propounded an "Alternative Dispute Resolution" policy (an arbitration agreement) for its employees, Minn executed an "opt-out" form, effectively relieving himself of any obligation to arbitrate any claims related to his employment. (*Id.* at ¶9; Ex. 1.)

On November 6, 2013, Plaintiff's counsel sent Defendants a demand letter which explicitly requested copies of any claims procedures applicable to the LTIPA. (Complaint at ¶25.) Having received no response, on January 9, 2014 Plaintiff again requested a copy of any claims procedures under either the LTIPA or the DIF. (*Id.*; Hicks Dec. at ¶2.) Plaintiffs repeated their request for any existing claims procedures on multiple occasions thereafter prior to filing suit, to no avail. *Id.*

On April 9, 2014, Minn filed suit in the Superior Court of San Francisco County, asserting causes of action for breach of both of the bonus plans under California law, which also constituted a failure to pay wages owed and gives rise to waiting time penalties under the California Labor Code, and common law conversion. (*See* Complaint.) Minn seeks, *inter alia,* damages arising out of the forfeiture of the LTIPA and DIF payouts, resulting penalties under the Labor Code, prejudgment interest, and attorneys' fees and costs.

Defendants removed this case on May 14, 2014, claiming that the bonus plans at issue are "Top Hat" plans subject to the Employee Retirement Income Security Act ("ERISA," 29 U.S.C. §§ 1001 *et seq.*). Plaintiff has filed a Motion to Remand and maintains

1    that this case was improperly removed. Hence, this Court has no jurisdiction to rule on

2    Defendants' Motion to Dismiss and/or Compel Arbitration.[2]

3          On May 27, 2014, *after removing this case to federal court and filing the instant*

4    *motion based in part on an alleged failure to exhaust administrative remedies*, Defendants

5    for the first time alleged the existence of some "claims procedures" under both the LTIPA

6    and DIF. (Ex. 1 to Hicks Dec.) The letter states that Defendants "now [are] ready to

7    administer and process your client's claims" under both bonus plans. *Id.* at 1.

8    **II.    THE LTIPA AND DIF ARE BONUS PLANS, NOT EMPLOYEE BENEFIT PLANS**
        **COVERED BY ERISA**

9

10         Defendants move for dismissal and assert that the Court lacks jurisdiction over the

     suit because all claims are pre-empted. Plaintiff agrees that this Court lacks jurisdiction, but
11
     not for the reasons offered by Defendants. Instead, there is no Federal Question jurisdiction
12
     because the bonus plans at issue here are not subject to ERISA in the first place, so the
13
     case must be *remanded,* as Plaintiff has requested in his pending Motion for Remand.
14

15         **A.    ERISA Covers Only Plans That Systematically Defer Compensation Until**
               **Termination or Retirement**

16         Defendants claim that all of Minn's causes of action are completely pre-empted by

17   ERISA because the LTIPA and DIF bonus plans (Exhibits 1 & 2 to the Complaint) are

18   ERISA plans. Contrary to Defendants' assertions, the LTIPA and the DIF are excepted

19   bonus plans not subject to ERISA.

20         ERISA covers "employee benefit plans," which are defined as an "employee benefit

21   plan[3] or an employee pension plan or … both." 29 U.S.C. § 1002(3). Specifically:

22   _____

23   [2] The arguments in Sections II(A), (B), (E) & (F) in this opposition are discussed in more
     detail in Plaintiff's pending Motion for Remand, and have been abbreviated here in the
     interest of brevity and to focus on matters distinct to the instant motion.
24   [3] Generally, "welfare benefit plans" are defined as plans maintained for the purpose of

**OPPOSITION TO MOTION TO DISMISS/COMPEL ARBITRATION**                                    5

[T]he terms "employee pension benefit plan" and "pension plan" mean any plan, fund, or program which was heretofore, or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund or program –

(i)     provides retirement income to employees, or

(ii)    results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,

regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing the benefits of the plan.

29 U.S.C. § 1002(2)(A). However, the Secretary of Labor's regulations interpreting § 1002 clarify that bonus plans like the LTIPA and DIF do not qualify as pension benefit plans because they do not "systematically defer" compensation to retirement and beyond:

Bonus program. For purposes of title I of the Act and this Chapter, the term "employee pension benefit plan" and "pension plan" shall not include payments made by an employer to some or all of its employees as bonuses for work performed, unless such payments are *systematically deferred* to the termination of covered employment or beyond, or so as to provide retirement income to employees.

29 C.F.R. § 2510.3-2(c) (emphasis added).[4]

Formal discovery has not yet commenced, but it is clear that the deferred bonus compensation awarded to Minn and then diverted into the LTIPA and DIF was not subject to any ERISA plan. Defendants characterized each award as a discretionary annual bonus for work performed during each respective year. (DIF at § 1; LTIPA at § 6.) The annual

_____

providing medical, disability, vacation benefits, or the like. *See* 29 U.S.C. § 1002(1). We note that Defendants' contend only that the LTIPA and DIF are "pension plans" and not welfare benefit plans. (MTD, Doc. #9 at p. 10:3-5.)

[4] Circuit Courts and this Court have stated that the Secretary of Labor's interpretations should be followed unless there are "compelling indications" that they are incorrect, and have in fact relied on this interpretation in particular to deny ERISA coverage to similar bonus plans as described *infra. See, e.g. Murphy v. Inexco Oil Co.,* 611 F.2d 570, 575 (5th Cir. 1980), citing 29 U.S.C. § 1135, which grants the Secretary interpretive powers; *In Re Segovia,* 404 B.R. 896, 917, n. 6 (N.D.Cal. 2009, Phyllis J. Hamilton, presiding) ("*Segovia*").

OPPOSITION TO MOTION TO DISMISS/COMPEL ARBITRATION                                          6

1   bonuses were then invested into a fund that Defendants managed in the case of the DIF, or

2   commingled with Defendants' general assets in the case of the LTIPA, their value when

3   paid out three years later dependent on Defendants' performance. (Minn Dec. at ¶5.)

4        Minn's claims under both bonus plans are for compensation that, under either plan,

5   is payable no later than three years after each portion of his annual bonus was diverted into

6   each plan. (LTIPA at § 4; Ex. 2 to the Hicks Dec. (re: DIF)). LTIPA payouts must be made

7   within 90 days of the end of each period (LTIPA at §6(d)) and payouts from the DIF must be

8   made on or around the last day of a particular three-year period (DIF at § 9.1).

9        Although each bonus plan does defer compensation, that deferral is never for only

10   for more than three years (the deferral would be *less* than three years in the event of death,

11   early retirement, or termination without Cause; LTIPA at § 7; DIF at § 8). Three years

12   cannot reasonably be considered to be a time period *systematically* calculated to run into

13   retirement or the end of employment. Indeed, the facially apparent purpose of both bonus

14   plans is to encourage the participants *not to retire* or otherwise leave Defendants' employ

15   so as to collect as many payouts from each plan as possible. Hence, neither bonus plan

16   "systematically defers" compensation until retirement within the meaning of ERISA.

17        In their papers, Defendants either grossly mischaracterize the plans, or deliberately

18   attempt to mislead the court. For example, Defendants assert that the DIF calls for payment

19   upon the occurrence of either termination without cause, retirement, death, or an

20   unforeseen emergency (MTD at 8:13-19),without explaining that those triggers only come

21   into play if they occur prior to the end of a three-year Deferral Period. (*See* DIF at § 9.1

22   ("Normal Distributions" are paid "on or around the last day of the Deferral Period")).

23   Defendants also assert that the *distributions* under each plan are not discretionary (MTD at

24   9:16-24), without explaining that the initial bonus awards that are diverted into the plan are

**OPPOSITION TO MOTION TO DISMISS/COMPEL ARBITRATION**                                 7

in fact discretionary (*see* LTIPA at § 6(A); DIF at § 1, defining "Compensation"). None of Defendants' employees are *entitled* to an annual bonus by contract.

### B.   Federal Courts, Including This Court, Have Uniformly Rejected Application of ERISA to Similar Bonus Plans

In the leading case[5] addressing the issue of whether employee bonus programs qualify as ERISA plans, *Murphy v. Inexco Oil Co.*, 611 F.2d 570, 572-74 (5th Cir. 1980), the Fifth Circuit held that the assignment of "participation units" in drilling prospects pursuant to a "Royalty Participation Agreement" was not an ERISA plan. In *Murphy,* employees were assigned discretionary "participation units" as performance bonuses which accrued when a given drilling prospect began to produce, and continued to accrue as long as the prospect continued to produce. *Id.* at 573. As here, "payments to some employees or their heirs [under the bonus plan were] likely to continue after the employee … retired or ceased work because of death or disability." *Id.* The court then noted that ERISA only governs employee pension benefit plans that "provided retirement income" or resulted "in a deferral of income by employees for periods to the termination of covered employment or beyond."  *Id.* at 575 (quoting 29 U.S.C. § 1002(2)).

The *Murphy c*ourt then explained that the ERISA definition of an "employee pension benefit plan" cannot "be read as an elastic girdle that can be stretched to cover any content that conceivably fit within its reach." *Murphy,* at 575. The "words 'provides retirement income' patently refer only to plans *designed* for the purpose of paying retirement income

---

[5] *See Oatway v. American International Group, Inc.,* 325 F.3d 184, 187 (3rd Cir. 2003), (noting that the leading case in "addressing bonus programs in general under ERISA is *Murphy*); *Lafian v. Electronic Data Systems Corp.,* 856 F.Supp. 339, 345 (E.D.Mich. 1994) ("The leading case in this area [of whether bonus plans are ERISA plans] is *Murphy*."); *Segovia, supra,* at 917 (relying on *Murphy* in the absence of controlling Ninth Circuit precedent on the issue of whether a long-term incentive plan was an ERISA plan).

1   as a result of their express terms or surrounding circumstances." *Id.* (emphasis added).

2   Significantly, "the mere fact that some payments under a plan may be made after an

3   employee has retired or left the company does not result in ERISA coverage." *Id.* Under

4   *Murphy* and its progeny, a bonus plan is only covered by ERISA when payments are

5   "*systematically* deferred to the termination of covered employment or beyond." *Id.*

6           Here, like the plaintiffs in *Murphy,* Minn was awarded annual discretionary

7   performance bonuses which were then diverted into the bonus plans to be paid out three

8   years thereafter. As in *Murphy*, Defendants' bonus plans were not "designed" to provide

9   retirement income, but instead for regular compensation *prior to* retirement.

10           In another analogous case, *Emmenegger v. Bull Moose Tube Co.*, 197 F.3d 929,

11   930 (8th Cir. 1999), the Eighth Circuit found a "phantom stock plan" ("PSP") created by an

12   employer to provide a financial interest in the company to members of its management to

13   be a bonus plan not subject to ERISA. Under the PSP at issue*,* the "shares" vested "one-

14   third at a time, on the first, second and third anniversaries of the Award Date." *Id.* at 931.

15   Participants were also permitted to "redeem their vested shares, at their option, anytime"

16   after five years. *Id.* The court noted that it "may be that the stock provides post-employment

17   income for some eligible participants, especially if they do not opt to redeem their shares

18   during their tenure with [the company]," but the plan was not an ERISA plan because the

19   participants could redeem their shares prior to retirement for any reason. *Id.* at 933. Hence,

20   the *Emmenegger* court found that the bonus plan was "not designed 'systematically' to

21   provide retirement income," even though it might defer some benefits to retirement or

22   termination. *Id.* Here, participants in the LTIPA and DIF were not even given the option of

23   deferring their payouts until retirement.

24           More recently in *Segovia, supra,* this Court, relying on *Murphy* and its progeny*,*

found that a long-term incentive plan similar to the LTIPA and DIF at issue here was not an ERISA plan, but an excepted bonus plan. It first found that the bonus plan's stated purposes were: "(1) to 'motivate key employees to produce a superior return;' and (2) 'to facilitate recruiting and retaining talented executives." *Id.* at 922. This Court then found that

> the mere fact that previously unexercised and unvested stock options might have vested on a participant's retirement . . . does not result in ERISA coverage, given that [the debtor] was able, under the [LTIPA], to withdraw the vested portion of her stock options at any time . . . *and was not required to systematically defer the withdrawal or payment until her retirement.*

*Id.,* citing *Murphy, supra,* at 576, and *Lafian, supra,* at 405 (emphasis added). This Court further held that even if the LTIPA at issue "may have under some circumstances incidentally provided for retirement, or allowed participants to defer income, that was not its principal purpose. For that reason alone, the plan is not covered by ERISA." *Segovia, supra,* at 922. Here, the awards are automatically paid out as soon as they are vested, and participants are not permitted to defer payments to retirement, or to any point beyond the three-year deferral period. Indeed, the stated purpose of the LTIPA is strikingly similar to that of the LTIPA at issue in *Segovia.* (LTIPA at § 1; the DIF has no stated purpose.)

Federal courts, including this Court in particular, have consistently found that bonus plans like Defendants' LTIPA and DIF are not ERISA plans because they are not designed to "systematically defer" payments to termination or retirement.[6] ERISA is not applicable to

---

[6] *See, e.g. Hagel v. United Land Company,* 759 F.Supp. 1199 (E.D.Va. 1991) (bonus agreement that provided employee with income over a five-year period was not an ERISA plan); *Oatway, supra,* (stock option plan designed to provide a financial incentive to remain with employer was not ERISA plan; post-retirement payments were incidental to goal of providing current compensation); *Houston v. Saracen Energy Advisors,* 2009 WL 890384 (S.D.Tex. March 27, 2009) (incentive phantom stock plan which vested in three years after initial award did not systematically defer payments to termination or retirement, thus not an ERISA plan); *Hahn v. National Bank, N.A.,* 99 F.Supp.2d 275, 277 (E.D.N.Y. 2000) (phantom stock plan that allowed exercise of awards at a rate of one-third per year was a bonus plan not covered by ERISA); *McKinsey v. Sentry Ins.,* 986 F.2d 401, 405-406 (10th

bonus plans that provide a fixed time period unrelated to retirement for liquidation of an award, like the three-year deferral periods under both bonus plans at issue here, despite any potential early triggers such as termination, retirement, or disability.

## C.   The Cases Cited by Defendants' Are Either Inapposite or Actually Support Plaintiff's Arguments

Defendants cite only two cases in their moving papers to support their assertion that the LTIPA and DIF bonus plans are ERISA plans. (MTD at p. 8.) Both are distinguishable from the instant case. Defendants cite to *Modzelewski v. RTC*, 14 F.3d 1374, 1376-1377 (9th Cir. 1994), and assert that essentially *any* contract that defers some compensation in any manner is a pension plan subject to ERISA. (MTD at 8:8-12). *Modzelewski* involved agreements for post-retirement payments and had absolutely nothing to do with bonus plans. There were no pre-retirement or termination payments in the *Modzelewski* plan, which was brought under 12 U.S.C. § 1821(e)(3), a statute related to the Federal Deposit Insurance Corporation, and ERISA pre-emption was not even at issue.

*Spitz v. Berlin Indus. Inc.,* 1994 WL 48593, (N.D.Ill., Feb. 16, 1994) is similarly inapposite. In *Spitz,* the plan at issue did *not* have rolling three-year deferral periods throughout the participants' employment like Defendants' bonus plans. Instead, Participants were not eligible to receive distribution of *all* deferred benefits *unless and until* they either: (1) died; (2) became permanently disabled; (3) terminated their employment after reaching the age of 60, or (4) reached age 60 after leaving the company. *Id.* at *4. Significantly, participants could withdraw up to 50% of their deferred funds, but not before they reached age 58. *Id.* No similar terms are present in Defendants' bonus plans. The *Spitz* court

---

Cir. 1993) (deferred compensation plan that allocated bonus amounts into an account that did not vest until seven years later but allowed withdrawals at any time during employment did not "systematically defer" payment until retirement).

**OPPOSITION TO MOTION TO DISMISS/COMPEL ARBITRATION**                        11

distinguished *Murphy, supra,* because 50% of a participant's funds in the *Spitz* plan could not be withdrawn until the near-retirement age of 58. Because of that required deferral to age 58, the *Spitz* court determined that the plan was designed to systematically defer income until retirement, unlike the plan in *Murphy* which provided *regular payments prior to retirement,* like Defendants' bonus plans here.[7]

### D.   Minn Did Not Fail to Exhaust Administrative Remedies, Because No Claims Procedures Actually Existed

As discussed above, Defendants' bonus plans not subject to ERISA. Hence, ERISA's administrative exhaustion requirement is inapplicable and cannot be grounds for dismissal. Even if the bonus plans were subject to ERISA, Minn cannot have failed to exhaust administrative remedies were not disclosed in the respective bonus plans (which were not provided to him until after he was terminated) or provided despite numerous requests prior to this litigation. (Complaint at ¶25; Hicks Dec. at ¶2.) Only after Defendants filed the instant motion did they first create and/or disclose any "claims procedures." *Id.*

ERISA's judge-made exhaustion requirement is not absolute. *Paese v. Hartford Life & Accident Ins. Co.,* 449 F.3d 435. 445 (2d. Cir. 2006). "Implicit in the exhaustion requirement is the condition that a plaintiff must have an administrative remedy to exhaust." *Kirkendall v. Halliburton, Inc.* 707 F.3d 173, 179 (2d. Cir. 2013). The regulations implementing ERISA explicitly provide an exception to the exhaustion requirement. Where a plan fails to establish or follow "reasonable" claims procedures as required by ERISA,

> a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of [ERISA] on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim.

---

[7] The *Spitz* court also found material the fact that the employer had registered its plan with the federal government as an ERISA plan. Defendants do not assert such registration.

OPPOSITION TO MOTION TO DISMISS/COMPEL ARBITRATION                                    12

29 C.F.R. § 2560.503–1(l); *see Vaught v. Scottsdale Healthcare Corp. Health Plan,* 546 F.3d 620, 626-627 (9th Cir. 2008). Neither bonus plan describes any "claim procedures." Indeed, Plaintiff specifically requested any such "claims procedures" applicable to either plan on multiple occasions prior to filing suit, and Defendants never even identified—no less produced—any  such procedures. *See Eastman Kodak Co. v. STWB, Inc.,* 452 F.3d 215, 221 (2d Cir. 2006) (no failure to exhaust where no claims procedure in place at the time plaintiff brought suit).  Therefore, even if the Court determines that the bonus plans are ERISA plans, Defendants cannot assert an exhaustion defense, and indeed must be estopped from doing so.[8]

### E.      Since The LTIPA and DIF Are Bonus Plans Not Subject to ERISA, They Cannot Be "Top Hat" Plans

Defendants' claim that both the LTIPA and DIF are "Top Hat" plans subject to ERISA. A Top Hat plan "provides certain highly compensated employees with *retirement benefits* in addition to, and on top of, the benefits provided by the employer's qualified [ERISA] plan." *Hampers v. W.R. Grace & Co.*, 202 F.3d 44, 46 n.3 (1st Cir. 2000) (emphasis added). The question of whether either the LTIPA or DIF is a Top Hat plan is irrelevant because "a 'Top Hat' plan must be an ERISA plan in the first instance" to be covered by ERISA. *Emmenegger, supra,* at 932, n. 6. Since *Murphy* and *Segovia* require a finding that ERISA does not apply to bonus plans like the LTIPA and DIF, whether the bonus plans could otherwise qualify as Top Hat plans is completely irrelevant.

### F.      Neither the LTIPA nor the DIF are Top Hat Plans

Even if it were (confusingly) possible for a bonus plan that is not an "employee

---

[8] Equitable defenses such as waiver, estoppel and equitable tolling are permitted in opposing an administrative exhaustion argument. *See Paese, supra,* at 444; *Kirkendall, supra,* at 179.

1   benefit plan" under ERISA to nevertheless be a Top Hat plan under ERISA, neither bonus

2   plan here meets those requirements. A plan applies to a "select group" for Top Hat

3   purposes when "the plan's coverage is limited to a small percentage of the employer's

4   entire workforce, and the select group has the ability to affect or substantially influence

5   (through negotiation or otherwise) the design and operation of the plan." *Grigg,* 2014 WL

6   109495 at *4 (E.D.Cal. Jan 10, 2014). The "select group" requirement has further been

7   divided into four factors by many courts: (1) the percentage of the total workforce invited to

8   join the plan, which usually must be less than 15% of the workforce; (2) the nature of the

9   participants' employment duties; (3) the compensation disparity between plan members

10  and non-members, in which the average participants' compensation must be twice the

11  average compensation of non-participants; and (4) the actual language of the plan

12  agreement. *See, e.g. Callan v. Merrill Lynch & Co., Inc.*, 2010 WL 3452372 at *10 (S.D.Cal.

13  Aug. 30, 2010). The first factor is quantitative, while the other three are qualitative.

14        Here, Minn estimates that over 40 of the approximately 75-80 employees at his San

15  Francisco office had to participate in each plan (a rate *of 50% or more*), well above the 15%

16  threshold necessary to meet this requirement. (Minn Dec. at ¶6.) Defendants cannot

17  dispute that they unilaterally enrolled Minn and all other participants in the plans based on

18  their job title alone, or that Minn could not negotiate or influence the terms, design, or

19  operation of either plan. (*Id.* at ¶1-6; Complaint at ¶¶15-16.) Nothing in either bonus plan

20  provides the average compensation of the LTIPA or DIF participants or Defendants' non-

21  participant employees. Finally, with respect to the "language of the plan" factor, "a plan

22  cannot merely state that it complies with ERISA's top hat exemptions in order to qualify

23  thereunder." *Callan, supra,* at *12. Rather, "there must be some indication that the plan is

24  actually administered consistent with the requirements of a 'top hat plan.'" *Grigg, supra,* at

\*6; citing *Callan, supra,* at \*12 and *Guiragoss v. Khoury,*  444 F.Supp.2d 649, 658 (E.D.Va. 2006). Here, there is no evidence that either bonus plan is "actually administered" in accordance with the Top Hat requirements.

In *Grigg,* that court denied the Defendant's motion to dismiss with respect to the bonus plan because there was no evidence on the face of the pleadings or in the record that any of the "select group" requirements were met. *Grigg, supra,* at \*6. Similarly here, the requirements cannot be satisfied at this stage of the proceedings based solely on the text of the respective plans attached to the Complaint.[9]

### III.    THE ARBITRATION PROVISION EMBEDDED IN THE LTIPA IS UNCONSCIONABLE AND UNENFORCEABLE UNDER CALIFORNIA LAW

It is the Court's duty at the outset to determine whether defendant's arbitration agreement is enforceable using contract principles which exist for enforcing other contracts. *See Armendariz v. Foundation Health Psychcare Services, Inc.*, 24 Cal.4th 83, 98 (2000) ("*Armendariz*"), C.C.P. § 1281.2; *Sonic-Calabasas-A Inc. v. Moreno,* 57 Cal.4th 1109 (2013). Like any other contract, an arbitration provision is unenforceable where it is unconscionable. C.C.P. § 1670.5. Unconscionability consists of both procedural and substantive aspects. A contract is procedurally unconscionable where it is a contract of adhesion, a concept that focuses on the manner in which the agreement was "negotiated." *Kinney v. United Healthcare Services, Inc.*, 70 Cal.App.4th 1322, 1399 (1999). Procedural unconscionability can also be found where there is "an absence of meaningful choice due to the inequality of bargaining power *or hidden terms*." *McCoy v. Superior Court,* 87 Cal.App.4th 354, 358 (2001). Substantive unconscionability is found where the terms are

---

[9] As the existence of an ERISA plan is a question of fact, further (no doubt hotly disputed) discovery would be necessary to determine the percentages of each Defendant's workforces that are participants, and other information related to the Top Hat requirements. Defendants cannot introduce any such extrinsic evidence on a Rule 12(b)(6) motion.

1    overly harsh, are one sided or are not within the reasonable expectations of the employee.

2    "The two elements work together in a sliding scale relationship. The more substantively

3    oppressive the contract term, the less evidence of procedural unconscionability is required

4    to come to the conclusion that the term is unenforceable." *See Id.* at 358 (quoting

5    *Armendariz*, *supra* at 114). Here, Defendants' arbitration provision concealed within the

6    undisclosed LTIPA is both procedurally and substantively unconscionable.

7          **A.**     **The Arbitration Agreement is Unquestionably Unconscionable Procedurally**

8

9          Procedural unconscionability exists where the contract is one of adhesion. "Adhesive

10   contracts are those where a party of superior bargaining strength drafts the contract and

11   imposes its terms in a take or leave it manner." *Fitz v. NCR Corp.*, 118 Cal.App.4th 702

12   (2004); *McCoy, supra*. Similarly, where there is no realistic opportunity for an employee to

13   negotiate an arbitration provision, it is procedurally unconscionable, even if the employee is

14   an executive making a significant amount of money. *Stirlen v. Super Cuts, Inc.,* 51

15   Cal.App.4th 1519, 1533 (1997). Here, Minn could not negotiate the arbitration provision

16   because he was not even aware of it until <u>after</u> his termination. (Minn Dec. at ¶7.) The

17   LTIPA's arbitration provision states that the arbitration will be "finally settled by the

18   American Arbitration Association (the "AAA") in accordance with the commercial arbitration

19   rules of the AAA," which Defendants have never provided to Minn.[10] Moreover, the

20   arbitration provision requires that prior to initiating arbitration, a participant (but not

21   Defendants) must comply with certain undisclosed "claims procedures" established in their

22   "sole discretion." *Id.* In fact, Defendants first notified Plaintiff's counsel of its heretofore

23   [10] In order to ascertain what those rules are, Plaintiff's counsel was compelled to seek out

24   the rules on the internet. A copy of those rules downloaded as of the date of this filing is included as Exhibit 3 to the Hicks Dec ("AAA Comm. Rules").

**OPPOSITION TO MOTION TO DISMISS/COMPEL ARBITRATION**          16

1    nonexistent "claims procedures" *only after it filed the instant motion*. (Hicks Dec., Ex. 1.)

2         In *Fitz, supra,* the court declined to enforce an arbitration agreement that

3    incorporated the rules of the AAA without attaching them, which required employees "to go

4    to another source to learn the full ramifications of the arbitration agreement." *Id.* at 721. In

5    *Harper v. Ultimo,* 113 Cal.App.4[th] 1402 (2003), the court refused to enforce an arbitration

6    agreement that incorporated, but did not provide, the rules of the Better Business Bureau.

7    In *Trivedi v. Curexo Technology Corp.,* 189 Cal.App.4[th] 387, 392-93 (2010), an arbitration

8    provision in an employment agreement between the plaintiff CEO and defendant company

9    was procedurally unconscionable where (as here) it was drafted by the company, was

10   mandatory, and the CEO was not given a copy of the AAA arbitration rules that were

11   referenced in the agreement. Here, Defendants not only failed to provide the applicable

12   rules and "claims procedures," it never provided the arbitration provision to Minn at all.[11]

13        What is more, if Defendants had notified Minn of the arbitration provision and given

14   him an opportunity to negotiate, he would have opted out of it. In 2012, defendant issued an

15   alternative dispute resolution policy to its employees, which Minn promptly opted out of.

16   (*See* Ex. 1 to Minn Dec.) There is no question that the concealed arbitration provision is

17   procedurally unconscionable.

18        **B.    The Arbitration Provision is Substantively Unconscionable**

19        The arbitration provision here (including its incorporated but undisclosed rules and

20   purported pre-arbitration claims procedures) is also substantively unconscionable for a

21   _____

22   [11] Defendants cite Murphy v. DirecTV, Inc., 724 F 3d 1218 (9th Cir. 2013) for the proposition
     that a party should be estopped from denying the existence of an agreement to arbitrate
23   where it seeks to enforce a broader contract containing the arbitration clause. But, Minn
     does not assert that there was no LTIPA agreement due to defendant's failure to provide a
     copy of it or obtain his signature. Rather, Defendants' failures compel the finding that the
24   arbitration provision in the LTIPA is procedurally unconscionable.

OPPOSITION TO MOTION TO DISMISS/COMPEL ARBITRATION                                      17

number of reasons: it lacks mutuality, purports to waive unwaivable statutory claims, requires onerous filing fees and expenses, and limits discovery, all in violation of *Armendariz* and its progeny, which remain good law.

### 1. The Provision Purports to Require Employer-Controlled Pre-Arbitration Dispute Resolution

A provision that requires the employee to first pursue resolution through the Company's internal channels supports a finding of substantive unconscionability. In *Nyulassi v. Lockheed Martin Corp.*, 120 Cal.App.4[th] 1267, 1273 n. 4 (2004), the agreement included a pre-arbitration dispute resolution requirement similar to the "Claims procedures" referred to (but not disclosed) in the LTIPA's arbitration provision. The *Nyulassi* court concluded that "Given the unilateral nature of the arbitration agreement, requiring plaintiff to submit to an employer-controlled dispute resolution mechanism (i.e., one without a neutral mediator) suggests that defendant would receive a 'free peek' at plaintiff's case, thereby obtaining an advantage if and when plaintiff were to later demand arbitration." *Id.* Similarly, in *Pokorny v. Quixstar, Inc.,* 601 F.3d 987, 999 (9th Cir. 2010), the Ninth Circuit held a pre-arbitration dispute resolution requirement to be substantively unconscionable finding that, among other flaws, it "amounts to little more than an exploratory evidentiary hearing" for the company in advance of any arbitration or other proceeding. Here, Defendants apparently intended to make up the "claims procedures" whenever such procedures would be beneficial to them, since they waited until after filing the instant motion to provide such procedures to Minn (and now seek to use these newly-crafted procedures to assert an ERISA exhaustion argument). These improper requirements support a finding of substantive unconscionability.

### 2. The Arbitration Provision Requires Minn to Pay Substantial Costs Unique to Arbitration

In *Armendariz*, the Court expressly ruled that a fee-sharing arrangement in a pre-dispute arbitration agreement that requires the employee to bear any type of expense that he would not otherwise bear in court is illegal:

> [W]e conclude that when an employer imposes mandatory arbitration as a . . . [that] process cannot generally require the employee to bear any *type* of expense that the employee would not be required to bear if he or she were free to bring the action in court.

*Id.* at 110-11 (emphasis added); *Sonic-Calabasas, supra,* at 1144-1145. The *Armendariz* Court further stated: "we conclude the imposition of substantial forum fees is contrary to public policy, and is therefore grounds for invalidating or 'revoking' an arbitration agreement and denying a petition to compel arbitration . . . ." *Id.* at 110.

In *O'Hare v. Municipal Resource Consultants*, 107 Cal.App.4th 267 (2003), the Court expressly held that an arbitration agreement was substantively unconscionable because, while the employment agreement was silent on allocation of costs, it explicitly, as here, incorporated the rules of the AAA, which allow for cost sharing. The AAA Commercial Rules (which Defendants never provided to Minn), also permit division of costs and hearing fees. The panel of arbitrators thus has unfettered discretion to allocate the costs of the arbitration, the arbitration fees, and the hearing between the parties and thus allocate more to Minn than he would be subjected to were he in court.

Furthermore, depending on the fee schedule utilized, the fees required by a party to bring an arbitration to hearing are either $11,450 or $12,450 (*see* AAA Comm. Rules at pp. 40 and 43, respectively), and that does not include payment of the required *three*-arbitrator panel (*Id.* at L-2(a), at p. 36), or all expenses of witnesses and arbitrators (*id.* at R-54, p. 29). Indeed, the arbitrators "may assess and apportion" all of the aforementioned compensation, fees, and expenses in any manner they deem fit. (*Id.* at R-47, p. 27). Such

1  costs will be far in excess of the $435 filing fee that Plaintiff paid to file his suit in state

2  court, and support a finding of substantive unconscionability.

3          **3.      The Provision Lacks Mutuality**

4          In *Armendariz*, *supra*, at 120, the California Supreme Court stated: "[A]n arbitration

5  agreement that is imposed in an adhesive context lacks basic fairness and mutuality if it

6  requires one contracting party, but not the other, to arbitrate all claims arising out of the

7  same transaction or occurrence or series of transactions or occurrences." Defendants'

8  arbitration provision lacks mutuality in two respects. First, as discussed above, only plaintiff

9  was required to have complied with some undisclosed "claims procedures" of which

10  Defendants notified Minn only after they filed the instant motion which also operates as free

11  pre-arbitration discovery for Defendants. Second, § 9(a) of the LTIPA grants Defendants

12  the right to modify or terminate the plan in any respect at any time.

13          In *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165 (9 Cir. 2003) (*overruled on other*

14  *grounds by AT&T Mobility v. Concepcion,* 131 S.Ct. 1740 (2011)), the employer attempted

15  to enforce an arbitration agreement that provided: "Circuit City may alter or terminate the

16  Agreement and these Dispute Resolution Rules and Procedures on December 31 of any

17  year upon giving 30 calendar days written notice to Associates." *Ingle, supra,*. at 1179. The

18  Ninth Circuit found the provision unconscionable:

19          Circuit City, then, may modify or terminate any and all dispute resolution
         agreements with its employees unilaterally. Notably, the arbitration agreement
20          affords no such power to employees. . . . Although the agreement requires Circuit
         City to provide exiguous notice to its employees of termination or any
21          modification, such notice is trivial when there is no meaningful opportunity to
         negotiate the terms of the agreement. By granting itself the sole authority to
22          amend or terminate the arbitration agreement, Circuit City proscribes an
         employee's ability to consider and negotiate the terms of her contract.
23          Compounded by the fact that this contract is adhesive in the first instance, this
         provision embeds its adhesiveness by allowing only Circuit City to modify or
24          terminate the terms of the agreement. Therefore, we conclude that the provision

affording Circuit City the unilateral power to terminate or modify the contract is substantively unconscionable."

*Id.* at 1179 (footnotes omitted). Here, Defendants' right to modify or terminate the arbitration provision does not even require the notice necessary in *Ingle,* and is substantively unconscionable.

### 4. The Provision Illegally Attempts to Waive Unwaivable Statutory Rights Under the California Labor Code

Defendants' arbitration provision expressly states that it is subject to another provision in the LTIPA (§ 9(h)), which states "Governing Law. All *rights and obligations* under the Plan shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to principles of conflict of laws." (Emphasis added). Minn asserts claims under the Cal. Labor Code related to his unpaid but earned wages under the LTIPA. Yet, under § 9(h), only Delaware's laws can be asserted, and the arbitration provision necessarily attempts to preclude Minn from asserting any of California's unwaivable statutory rights to the extent they are related to any "rights and obligations under the plan." The undisclosed choice of law provision incorporated into the arbitration clause clearly runs afoul of *Armendariz* and conflicts of laws principles and is substantively unconscionable (rendering that provision unenforceable as discussed below).

### 5. The Undisclosed but Incorporated AAA Commercial Rules Permit The Arbitrator to Deny Adequate Discovery

Under *Armendariz, supra,* and *Sonic-Calabasas, supra,* an arbitration agreement must provide adequate discovery for the parties to be able to arbitrate their positions. Courts have found substantive unconscionability where, as here, agreements provide the arbitrator discretion as to what if any discovery is permitted. (*See* AAA Comm. Rules at L-3(f) which only permits depositions in "exceptional cases," and R-22, which permits but

1  does not require the panel to <u>allow</u> "reasonable" document requests.")[12] "Given that [the

2  employer] is presumably in possession of the vast majority of evidence that would be

3  relevant to employment-related claims against it, the limitations on discovery, although

4  equally applicable to both parties, work to curtail the employee's ability to substantiate any

5  claim against [the employer]." *Kinney, supra,* at 1332. "The lack of adequate discovery in

6  arbitration proceedings leads to the de facto frustration of the employee's statutory rights."

7  *Armendariz*, *supra*, at 104. *See also Fitz*, *supra*, at 717 (arbitrator's discretion, which was

8  limited by an "impossibility" and "compelling need" standard was inadequate discovery

9  because the plaintiff was initially entitled to such "scant discovery that [she is] unlikely to be

10 able to demonstrate to the arbitrator a compelling need for more discovery."); *Martinez v.*

11 *Master Protection Corp.*, 118 Cal. App. 4th 107, 118-119, n. 6 (2004) (court found the

12 discovery limitation providing only one deposition absent a showing of "substantial need," to

13 evidence the substantive unconscionability of the agreement)

14      A minimum standard of fairness (since, as here, the employer is almost always in

15 possession of nearly all relevant documents and other information) is not ensured when the

16 taking of depositions and availability of document requests is left to the arbitrator's

17 discretion to determine that the circumstances are "exceptional." Limits on the number of

18 depositions or documents available to the employee greatly hamper his ability to prove his

19 or her case, particularly when pre-arbitration resolution procedures provide free discovery

20 to the employer, as here. Accordingly, the restrictions on discovery that Defendants

21 incorporated into the LTIPA's arbitration provision do not provide "adequate" discovery to

22 Plaintiff under *Armendariz*, further supporting a finding of substantive unconscionability.

23

24 [12] This rule applies specifically to "Large Complex Commercial Disputes," defined as any
dispute where, as here, a party seeks in excess of $500,000. (AAA Comm. Rules at p.9.)

OPPOSITION TO MOTION TO DISMISS/COMPEL ARBITRATION                    22

### 6.     The Concealed Choice-of-law Provision is Unenforceable.

Defendants may assert that the LTIPA's Choice-of-law provision requires that Delaware law be applied. However, a "weaker party to an adhesion contract may seek to avoid enforcement of a choice-of-law provision therein by establishing that 'substantial injustice' would result from its enforcement or that superior power was unfairly used in imposing the contract [indicating that evidence of unfair use of bargaining power may defeat enforcement of a forum-selection clause contained in an adhesion contract]" *Samaniego v. Empire Today,* 205 Cal.App.4th 1138, 1148 (2012) (internal citations omitted, alterations in original), citing *Washington Mutual Bank, FA v. Superior Court,* 24 Cal.4th 906 (2001). The *Samaniego* court continued:

> [t]hus, a choice-of-law provision, like any other contractual provision, will not be given effect if the consent of one of the parties to its inclusion in the contract was obtained by improper means, such as by misrepresentation, duress, or undue influence, or by mistake. Whether such consent was in fact obtained by improper means or by mistake will be determined by the forum in accordance with its own legal principles.

*Id.* internal quotations omitted). The *Samaniego* court then applied those principles to find unenforceable a choice-of-law provision that was provided to Spanish-speaking employees only in an adhesive contract in English that the workers could not understand. Similarly here, Defendants did not disclose to Minn the choice-of-law provision until after it terminated him, when it first provided the LTIPA to him. Defendants' concealment of the choice-of-law provision renders it unconscionable and unenforceable.

### C.     <u>The Offending Terms Cannot Be Severed or Limited</u>

In deciding whether an unconscionable provision should be severed, "[t]he overarching inquiry is whether the interests of justice . . . would be furthered by severance." *Armendariz*, *supra* at 124 (internal quotations omitted). In *Armendariz*, the Supreme Court

1    held that more than one unlawful provision in an arbitration agreement weighs against

2    severance. *Id.* at 124. The Court stated: "Such multiple defects indicate a systematic effort

3    to impose arbitration on an employee not simply as an alternative to litigation, but as an

4    inferior forum that works to the employer's advantage." *Id.* Subsequent decisions have

5    refused to apply severance to an agreement that contains more than one unconscionable

6    provision. *See*, *e.g.*, *Fitz*, *supra,* at 726-727; *Ferguson v. Countrywide Credit Industries,*

7    *Inc.*, 298 F.3d 778, 787-88 (9th Cir. 2002); *Abramson v. Juniper Networks, Inc.,* 115 Cal.

8    App. 4th 638, 666-667 (2004); *Pokorny*, *supra*. One additional reason weighing against

9    severance is the employer's evident lack of good faith in including the unconscionable

10   provision. In *Armendariz,* the Court noted:  "An employer will not be deterred from routinely

11   inserting such a deliberately illegal clause into the arbitration agreements it mandates for its

12   employees if it knows that the worst penalty for such illegality is the severance of the clause

13   after the employee has litigated the matter."  *Id.* at 124 n. 13.

14       Here the arbitration provision is *extremely* procedurally unconscionable in that it was

15   never disclosed to Minn until after Defendants fired him without cause. Even after

16   Defendants finally disclosed the provision, they never provided the AAA's *commercial* rules

17   it incorporated, and only after filing the instant motion did they create out of thin air some

18   "claims procedures" that it now seeks to enforce against him and obtain free discovery.

19       The LTIPA's arbitration provision is also substantively unconscionable based on its

20   multiple offending terms: lack of mutuality, its failure to provide adequate discovery,

21   improper apportionment to Minn of costs unique to arbitration, and its requirement that Minn

22   make some evidentiary showing to Defendants prior to even attempting to arbitrate the

23   case. Furthermore, the provision attempts to waive all unwaivable statutory rights and

24   obligations under the California Labor Code entirely. Hence the provision is irreparably

1  tainted with unconscionability, its offending terms cannot be severed or limited, and it

2  cannot be enforced.

3  **CONCLUSION**

4      The LTIPA and DIF plans are bonus plans not subject to ERISA. Thus, there is no

5  federal question jurisdiction upon which the instant matter could be properly removed, and

6  no basis for this Court to rule on Defendants' motion. Furthermore, Minn cannot have failed

7  to exhaust administrative remedies that did not exist until after he filed this action. Finally,

8  Defendants cannot compel arbitration based on an unconscionable and unenforceable

9  provision of the LTIPA that they did not disclose to him until after they terminated him. If the

10  Court does not grant Plaintiff's pending Motion for Remand, then he respectfully requests

11  that the Court deny the instant motion in its entirety.[13]

12      Respectfully submitted,

13  Date:  June 4, 2014

        HOYER & ASSOCIATES

15          Ryan L. Hicks
16          Attorneys for Plaintiff
        SEUNG MINN

---

[13] If the Court grants any portion of the Motion to Dismiss, Plaintiff hereby requests leave to amend his Complaint to conform with the evidence supporting this Opposition. *See* Fed. R. Civ. P. 15(a).

OPPOSITION TO MOTION TO DISMISS/COMPEL ARBITRATION         25